IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALASKA WILDERNESS LEAGUE, 122 C Street NW,   )
Washington, DC, 20001; CENTER FOR BIOLOGICAL   )
DIVERSITY, P.O. Box 710, Tucson, AZ 85702-0710;   )
GREENPEACE, INC., 702 H Street, NW, Suite 300, Washington,   )
DC 20001; NATURAL RESOURCES DEFENSE COUNCIL, 40   )
West 20th Street, New York, NY 10011; RESISTING   )
ENVIRONMENTAL DESTRUCTION ON INDIGENOUS   )   Case No.
LANDS, P.O. Box 74667, Fairbanks, AK 99707; and SIERRA   )
CLUB, 85 Second Street, 2nd Floor, San Francisco, CA 94105;   )
  )
     *Plaintiffs*,   )
  )
      v.   )
  )
SALLY JEWELL, in her official capacity as Secretary of the   )
Interior, 1849 C Street NW, Washington, DC 20240, and UNITED   )
STATES FISH AND WILDLIFE SERVICE, 1849 C Street NW,   )
Washington, DC 20240-0001;   )
  )
     *Defendants*.   )
                 )

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(5 U.S.C. §§ 702-706; 42 U.S.C. § 4332; 16 U.S.C. § 1371)

# SUMMARY

1. This action challenges a regulation that permits the offshore oil and gas industry to harm (or "take") legally-protected Pacific walruses in the Chukchi Sea off the coast of northern Alaska incidental to oil exploration activities that include drilling, seismic surveying, and use of vessels, planes, and helicopters. The Chukchi Sea is the primary summer habitat for the majority of the walrus population, including nearly all mothers and calves. Walruses rely on sea ice in the Chukchi Sea to rest, rear their calves, avoid predators, and reach their feeding grounds. In recent years, sea ice in the Chukchi Sea has been melting at unprecedented rates due to human-induced climate change. These changes profoundly affect walruses, which now come ashore in the tens of thousands at coastal haulouts where they are vulnerable to disturbances that can cause deadly stampedes and are forced to swim long distances to find food. The regulation challenged here would allow the oil industry to add to these stresses by permitting industrial oil exploration in critically important walrus habitat, including the Hanna Shoal, where walruses swim to feed in large numbers throughout the summer. The Defendants violated federal law by deferring analysis and mitigation of these impacts, which they recognize could exceed statutory limits, to a later, non-public process when adopting the regulation.

2. Plaintiffs Alaska Wilderness League, Center for Biological Diversity, Greenpeace, Inc., Natural Resources Defense Council, Resisting Environmental Destruction on Indigenous Lands (REDOIL), and Sierra Club challenge the failure of Defendants Sally Jewell, United States Secretary of the Interior, and the United States Fish and Wildlife Service to comply with the Administrative Procedure Act, 5 U.S.C. §§ 702-706, (APA), the Marine Mammal Protection Act, 16 U.S.C. §§ 1361-1423, (MMPA), and the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f, (NEPA), in promulgating the final five-year incidental take regulation

on June 12, 2013.  *See* Marine Mammals; Incidental Take During Specified Activities, 78 Fed. Reg. 35,364 (June 12, 2013) (codified at 50 C.F.R. §§ 18.111-18.119).  In promulgating the regulation, the Fish and Wildlife Service concluded that activities under the regulation would take only small numbers of walruses with no more than a negligible impact on the population.  But this conclusion is arbitrary, because the agency acknowledged that oil industry operations in the Hanna Shoal area may encounter large numbers of walruses and have non-negligible impacts and unlawfully deferred determining the mitigation needed to avoid those illegal outcomes in the Hanna Shoal area to a later case-by-case, non-public process.  The Fish and Wildlife Service also arbitrarily concluded that the regulation sets forth the means for effecting the least practicable adverse impact to walruses, despite acknowledging that additional mitigation measures may be required for operations in the Hanna Shoal area and, as described above, unlawfully deferring identification of those measures.  Plaintiffs also challenge the accompanying Environmental Assessment (EA) and "finding of no significant impact" issued by the agency pursuant to NEPA, for failure to analyze the potential environmental impacts of the regulation, particularly in connection with walrus usage of the Hanna Shoal and travel corridors between haulouts and the shoal, and for arbitrarily concluding that those impacts were adequately mitigated.

3.      Walruses are uniquely adapted to living in the Arctic Ocean, and nearly the entire population, including mothers and calves, spends from June to October foraging in the Chukchi Sea.  Because they cannot remain in the water all the time, walruses have evolved to using floating sea ice for resting, calving, weathering storms, avoiding predators, passive transport, and as a platform from which to feed on clams and other benthic organisms on the sea floor of the relatively shallow continental shelf.  Historically, sufficient summer sea ice remained over these shallower waters in the Chukchi Sea for walruses to use as resting platforms close to their feeding

2

grounds. Due to the effects of climate change, however, the extent of summer sea ice in the

Chukchi Sea has diminished dramatically in recent years, leaving walruses without sea-ice

platforms over shallow continental shelf feeding grounds. In these low-ice years, walruses

abandon the ice as it retreats northward over deeper water and congregate in the tens of thousands

at coastal haulouts, including on the U.S. Chukchi Sea coast. Walruses in these haulouts

generally are far from their ocean feeding areas and are vulnerable to disturbance from human

activities, which can cause stampedes that result in trampling deaths.

4. Some areas of the Chukchi Sea appear to be particularly important to walruses.

One such area is the Hanna Shoal, a highly productive shallow-water area beginning about 75

miles off the Chukchi coast and, as the Fish and Wildlife Service defines it in the regulation,

covering about 9,500 square miles. Walruses use the Hanna Shoal for feeding, and at times tens

of thousands of animals can be found in the area. Historically, sea ice has remained in this area

over the summer, providing feeding platforms for the walrus. However, even as sea ice retreat in

recent years has caused walruses to use coastal haulouts, the area has remained important to

walruses. Large numbers have been observed in the area, commuting many miles from coastal

haulouts on the U.S. Chukchi Sea coast to the Hanna Shoal to forage.

5. At the same time that global warming is wreaking havoc on the Chukchi Sea

ecosystem, the Secretary of the Interior has opened the door to large-scale oil industry

development in this otherwise pristine environment. Industrial oil and gas exploration in the

Chukchi Sea overlaps with walrus use areas, and exploratory activities routinely encounter

walruses, sometimes in large numbers. Vessels and aircraft used in oil exploration can disturb

walruses, causing them to abandon their haulouts on ice or land and to avoid areas, including

open waters, where those activities are occurring. Exploration drilling also runs the risk of oil

spills, which could have devastating consequences if they reach aggregations of walruses. Some of these activities could take place at or near the Hanna Shoal and the walrus commuting corridor between the shoal and coastal haulouts.

6. The challenged incidental take regulation covers the authorization of oil company operations throughout the Chukchi Sea, including in and near the Hanna Shoal. The Fish and Wildlife Service acted arbitrarily in promulgating the regulation. It concluded that the covered activities would take only a small number of walruses and would have no more than a negligible impact on the walrus population. However, it also conceded that covered operations in the Hanna Shoal could encounter large numbers of walruses and have a non-negligible impact. The Fish and Wildlife Service similarly concluded that the mitigation and monitoring measures contained in the regulation ensured the least practicable adverse impacts to walruses, while acknowledging that additional, undetermined measures may be required for operations in the Hanna Shoal. Instead of assessing in its rulemaking the potential effects on walruses of oil industry operations in the Hanna Shoal area and imposing the mitigation measures required to assure that only small numbers of walruses could be taken and only with a negligible impact on the population, and identifying the means of effecting the least practicable adverse impact, the Fish and Wildlife Service deferred analysis of oil industry operations in the Hanna Shoal area to a later, non-public, case-by-case process. This approach violates the APA and MMPA.

7. The Fish and Wildlife Service prepared an EA under NEPA and issued a "finding of no significant impact," concluding that the decision to promulgate the regulation would not have significant effects on the environment and therefore did not require preparation of an environmental impact statement (EIS). However, the Fish and Wildlife Service acknowledged that operations under the regulation in the Hanna Shoal could have serious effects on walruses.

Rather than analyzing those impacts in an EIS, or ensuring that they would be adequately mitigated, the Fish and Wildlife Service deferred analysis and mitigation of activities in the Hanna Shoal or travel corridors between haulouts and the shoal to a future, non-public process. This approach violates NEPA.

8.      The incidental take regulation promulgated under the MMPA, any letters of authorization issued pursuant to this regulation, and the underlying environmental analysis carried out under NEPA must be set aside.

## JURISDICTION

9.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.  Judicial review is available under the APA, 5 U.S.C. §§ 701-706.

10.      Defendants have not remedied their violations of the MMPA and NEPA and are in violation of these statutes under the standards of review provided by the Administrative Procedure Act.  There exists an actual controversy between the parties within the meaning of 28 U.S.C. § 2201.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) as this civil action is brought against an agency of the United States and an officer of the United States acting in her official capacity and under color of legal authority, no real property is involved in this action, and the legal violations occurred within this judicial district.

## PLAINTIFFS

12.      Plaintiff Alaska Wilderness League is a non-profit organization with approximately 100,000 members and activists.  Alaska Wilderness League was founded in 1993 to advocate for protection of Alaska's public lands that are threatened with environmental

5

degradation.  Since its inception, it has taken an active role on issues related to oil and gas development in Alaska.  Its Alaska office has four full-time employees and houses its Arctic Environmental Justice Program.  Through advocacy and education, the Alaska Wilderness League's Arctic Environmental Justice Program works closely with communities in the Arctic affected by development.  Alaska Wilderness League is committed to honoring the human rights and traditional values of the people of the Arctic, and the shared interest in protecting critical areas for future generations.

13.    Plaintiff Center for Biological Diversity is a non-profit organization with offices in Alaska, Arizona, California, Florida, Minnesota, Nevada, New Mexico, New York, Oregon, Vermont and Washington.  The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health.  The Center has more than 800,000 members and online activists.  The Center actively is involved in species and habitat protection issues throughout the United States, including protection of Arctic wildlife threatened by oil and gas development.

14.    Plaintiff Greenpeace, Inc. is a California non-profit corporation with offices throughout the United States, including in Washington, D.C. and San Francisco.  Greenpeace is a non-violent environmental organization.  Its mission is to raise public awareness of environmental problems and promote changes that are essential to a green and peaceful future.  There are over 320,000 current Greenpeace members in the United States.  For more than a decade Greenpeace has been a lead advocacy organization working to raise awareness of global warming and the protection of wildlife, and to pressure for serious cuts in greenhouse gas emissions through local, national and global action.  In the United States, Greenpeace has run campaigns aimed at stopping global warming by phasing out fossil fuel use and promoting renewable energy systems.  As a

6

part of these efforts Greenpeace has actively worked to protect the Arctic Ocean from the harmful effects of oil and gas activities.

15.     Plaintiff Natural Resources Defense Council (NRDC) is a non-profit environmental membership organization with more than 300,000 paid up members throughout the United States.  It has had a longstanding and active involvement in the protection of the environment in Alaska's Arctic, including the Beaufort and Chukchi seas.  With its nationwide membership and a staff of lawyers, scientists, communications specialists, and other environmental professionals, NRDC gathers, analyzes, and uses information about federal government proposals to shape its advocacy on a diverse range of land and wildlife management and resource development issues, including many related to the Arctic.

16.     Plaintiff Resisting Environmental Destruction on Indigenous Lands (REDOIL) is a network of grassroots Alaska Natives of the Inupiat, Yupik, Aleut, Tlingit, Gwich'in, Eyak and Denaiana Athabascan tribes, including residents of Arctic Ocean coastal communities, operating as a non-profit educational organization with 501(c)(3) status.  REDOIL takes an active role in addressing the human and ecological health impacts of the unsustainable development practices of the fossil fuel industry in Alaska.  It advocates for the preservation of subsistence rights for Native Alaskans, self-determination rights of tribes in Alaska, a just transition from fossil fuel development, and the implementation of tribal options for sustainable development.

17.     Plaintiff Sierra Club is a national non-profit organization having approximately 750,000 members dedicated to the exploration, enjoyment, and preservation of the scenic and natural resources of the United States, including Alaska.  The Sierra Club works towards educating and enlisting the public to protect and restore the quality of the natural environment. The Sierra Club's interests encompass a wide range of environmental issues, including wildlife

conservation, public lands and waters, endangered species, clean water, and clean air. The Sierra Club has long been active in issues relating to the impacts of oil and gas leasing and development in America's Arctic.

18. Plaintiffs' members, directors, and staff visit or otherwise use and enjoy the Chukchi Sea and adjacent coastal region for recreation, wildlife viewing, education, research, photography, or aesthetic and spiritual enjoyment, and enjoy or otherwise experience walruses that inhabit the Chukchi Sea and adjacent coastal areas, and their habitat. Plaintiffs' use and experience of walruses is affected by the health and condition of walrus individuals and populations and their habitat in the wild. Any activities, such as oil and gas exploration, which destroy, degrade, or diminish walrus habitat, or which kill, injure, harm, harass, or displace walruses also by extension interfere with Plaintiffs' use and enjoyment of this species and its habitats. As such, these activities directly and irreparably injure the interests of Plaintiffs and their members, directors, and staff.

19. Because the MMPA prohibits the unpermitted take of walruses, absent authorization for such take from the Secretary, none of these activities which harm walruses and their habitats lawfully could occur in the Chukchi Sea. Therefore, the issuance of the incidental take regulation at issue here by the Secretary allows the initiation and continuation of activities that harm walruses, their habitats, and, by extension, Plaintiffs' interests.

20. Plaintiffs also have suffered informational and procedural injuries from the Secretary's failure to comply with the MMPA and NEPA in the issuance of the incidental take regulation. These injuries are connected to Plaintiffs' substantive conservation, recreational, scientific, and aesthetic interests. Plaintiffs' members, directors and staff rely on the Secretary to comply with the requirements of the MMPA and NEPA through public processes and to prepare

8

adequate environmental analyses as called for by these statutes. Plaintiffs rely on these analyses to achieve their organizational purposes, including: monitoring the use of the marine environment and the management of marine wildlife; monitoring compliance with the law concerning the management of these species; educating members, directors, staff, and the public concerning the management of these species; and advocating policies that protect walruses and their habitat.

21. Plaintiff groups submitted comments to the Secretary on her proposed rule to authorize the incidental take of walruses during oil and gas activities in the Chukchi Sea and adjacent coastal areas and the Draft EA relied upon by the Secretary.

22. The interests and organizational purposes of the Plaintiffs will be injured directly and irreparably by the Secretary's violation of law as described in this Complaint. Unless this Court grants the requested relief and orders the Secretary to comply with the MMPA and NEPA, harm to walruses will continue to accrue, and the aesthetic, recreational, educational, professional, scientific, spiritual, moral, and conservation interests of Plaintiffs and their members, directors, and staff will continue to be affected adversely.

## DEFENDANTS

23. Defendant Sally Jewell, United States Secretary of the Interior, is the highest ranking official within the Department of the Interior and, in that capacity, has ultimate responsibility for the administration and implementation of the MMPA with regard to walruses, and for compliance with all other federal laws applicable to the Department of the Interior, including NEPA. She is sued in her official capacity.

24. Defendant United States Fish and Wildlife Service is a federal agency within the Department of the Interior authorized and required by law to protect and manage the fish, wildlife

and native plant resources of the United States, including enforcing the MMPA. The Fish and Wildlife Service has been delegated authority by the Secretary of the Interior to implement the MMPA for walruses, taking responsibility for making decisions and promulgating incidental take regulations, including the regulation at issue in this suit.

## LEGAL FRAMEWORK

### I.     The Administrative Procedure Act

25.     The APA authorizes courts to review agency actions and "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The regulation and the EA and finding of no significant impact are reviewed under this provision of the APA and for compliance with the MMPA and NEPA, respectively.

### II.    The Marine Mammal Protection Act

26.     Congress enacted the MMPA in order to preserve healthy marine mammal populations and replenish waning marine mammal populations. 16 U.S.C. § 1361(2). The "primary" objective of the MMPA is to maintain the "health and stability of the marine ecosystem" through the retention of marine mammal populations as a "significant functioning element in the ecosystem of which they are a part." 16 U.S.C. §§ 1361(6), (2). "Whenever consistent with this primary objective, it should be the goal to obtain an optimum sustainable population keeping in mind the carrying capacity of the habitat." 16 U.S.C. § 1361(6).

27.     To those ends, the MMPA imposes a general moratorium on the taking of marine mammals. 16 U.S.C. § 1371(a). Under the MMPA, the term "take" is broadly defined to mean "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."

10

16 U.S.C. § 1362(13). "Harassment" is further defined to include acts of "torment" or "annoyance" that have the "potential" to injure a marine mammal or marine mammal stock in the wild or have the potential to "disturb" them "by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." 16 U.S.C. § 1362(18).

     28.    The MMPA provides several narrow exceptions to the moratorium for takings. 16 U.S.C. § 1371(a)(5). A 1981 amendment authorizes the Secretary to promulgate incidental take regulations, with a maximum duration of five years, that enable U.S. citizens who are engaged in a specified activity to take small numbers of marine mammals incidental to the specified activity. 16 U.S.C. § 1371(a)(5)(A). To ensure the purposes of the Act were achieved, Congress carefully circumscribed the ability of the agencies to authorize such incidental takings. The restrictions on incidental take regulations include the following: (1) the taking must be incidental to a "specified activity"; (2) the taking may only occur "within a specified geographic region"; (3) the agency may only authorize "incidental, but not intentional" takings; (4) only "small numbers" of a population may be taken; and (5) prior to authorizing incidental takings and after notice and opportunity for public comment, the agency must (a) find that "the total of such taking . . . will have a negligible impact" on the affected population; (b) find that the total of such takings "will not have an unmitigable adverse impact on the availability of [the population] for taking for subsistence uses"; and (c) prescribe regulations that (i) establish permissible methods of taking and "other means of effecting the least practicable adverse impact" on the population and its habitat; (ii) impose mitigation measures that minimize adverse impacts to the species and its availability for subsistence harvest; and (iii) impose monitoring and reporting requirements. 16 U.S.C. § 1371(a)(5)(A).

29.     The Secretary has promulgated general regulations that govern implementation of the incidental take provisions of the MMPA.  *See* 50 C.F.R § 18.27.  These regulations create a two-step process.  The Secretary first issues an incidental take regulation that governs a specified activity, and then issues letters of authorization (LOAs) to individual applicants, which authorize them to take marine mammals incidentally through activities covered by the incidental take regulation.  *See* 50 C.F.R § 18.27.  The issuance of an LOA is based on a determination that the level of anticipated incidental take requested by the applicant is "consistent with the findings made for the total taking allowable under the specific [incidental take] regulations." 50  C.F.R § 18.27(f)(2).  There is no public comment process for LOAs, and the Secretary is not required to publish notice of the issuance of any LOAs in the Federal Register until 30 days after they are issued.  50 C.F.R § 18.27(f)(3).

30.     The Secretary alternatively, upon request, may authorize take in the form of harassment by an Incidental Harassment Authorization (IHA) for a period of not more than one year.  16 U.S.C. § 1371(a)(5)(D).  The criteria for issuance of an IHA are similar to those for the five year incidental take regulation, but an IHA is not available in the Arctic if the activity has the potential to result in the serious injury or death of a marine mammal.  Like the promulgation of an incidental take regulation, the IHA process requires the Secretary to publish a draft proposal and solicit public comment.

31.     To ensure all decisions related to marine mammals are made on the basis of the best scientific information, Congress established the United States Marine Mammal Commission and charged it to make recommendations to the Secretary on matters related to marine mammals. The MMPA requires that any deviation from the Marine Mammal Commission's recommendations be explained in detail.  16 U.S.C. § 1402(d).

12

### III.    The National Environmental Policy Act

32.      NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  It was enacted in 1970 to put in place procedures to insure that, before irreversibly committing resources to a project or program, federal agencies "encourage productive and enjoyable harmony between man and his environment," "promote efforts which will prevent or eliminate damage to the environment," and "enrich the understanding of the ecological systems and natural resources important to the Nation."  42 U.S.C. § 4321.

33.      Fundamentally, NEPA seeks to guarantee that: (1) agencies take a "hard look" at the environmental consequences of their actions before these actions occur by ensuring that the agency carefully considers detailed information concerning potentially significant environmental impacts; and (2) agencies make the relevant information available to the public and officials prior to decisions and actions, so that the public and officials may play an informed role in both the decision making process and the implementation of that decision.  *See, e.g.*, 40 C.F.R. § 1500.1.

34.      NEPA requires a federal agency to prepare an EIS for a proposed agency action that may have a significant effect on the environment.  *See* 42 U.S.C. § 4332(2)(C).  The fundamental purpose of an EIS is to force the decision-maker to ensure that the policies and goals defined in NEPA are infused into the actions of the federal government. 40 C.F.R. § 1502.1.

35.      An agency may first prepare a less detailed environmental assessment to determine whether the project may significantly affect the environment and requires a full EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9.  An EA is "a concise public document" that serves, among other things, to "provide sufficient evidence and analysis for determining whether to

prepare an environmental impact statement or a finding of no significant impact."

40 C.F.R. § 1508.9. An EA must take a hard look at the potential environmental impacts of a proposed agency action, evaluating all important aspects of such impacts. Any finding of no significant impact, excusing preparation of a full EIS, must reflect a reasoned decision based on the facts found. *See* 5 U.S.C. § 706.

36.     If, after preparation of an EA, substantial questions persist whether the proposed action will have significant environmental effects, an agency must prepare an EIS. If, after preparing an EA, the agency determines an EIS is not required, the agency must provide a convincing statement of reasons why the project's impacts are insignificant and issue a finding of no significant impact. 40 C.F.R. §§ 1501.4, 1508.9 & 1508.13.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.     The Chukchi Sea**

37.     The Chukchi Sea is a shallow continental shelf sea in the Arctic Ocean off the northern coast of Alaska and eastern Russia, north of the Bering Strait and west of the Beaufort Sea. It provides habitat to a host of wildlife species including walruses and numerous other marine birds and mammals.

38.     The Chukchi Sea is a dynamic Arctic marine environment. Portions of the sea seasonally fluctuate between solid, continuous sea ice, liquid sea-water, and various intermittent states. Changes in average ambient temperatures affect the extent, concentration, and seasonal duration of sea ice in the Chukchi Sea and throughout the Arctic.

39.     During recent decades, the Arctic has warmed more rapidly than any other region on earth. In Alaska, winter temperatures have increased by as much as three to four degrees Celsius during the past 50 years. The Arctic is expected to continue to warm at a faster

rate than the rest of the earth.

40.     The extent of summer sea ice in the Chukchi Sea has diminished dramatically in recent years.  The Arctic Ocean September minimum sea-ice extent reached a new record low in 2012 of 3.41 million square kilometers (1.32 million square miles), which is about half the size of the average minimum extent from 1981-2010.  In 2014, the sea ice shrank to 5.02 million square kilometers (1.94 million square miles), the sixth-lowest extent in the satellite record.  The past ten years (2005-2014) have seen the ten lowest minimum September sea-ice extents in the satellite record.  Scientists predict that the trend will continue.

41.     Many of the species that inhabit the Chukchi Sea, such as walruses, polar bears, and ice seals, uniquely are adapted to and depend on sea ice.  The rapid decline of sea ice in the Chukchi Sea is having and is expected to continue to have profound negative effects on these species.

## II.     The Pacific Walrus

42.     Pacific walruses are currently considered a single stock of animals whose population ranges across the border between Alaska and Russia.  The size of the walrus population has never been known with certainty, but the most recent available population analysis estimated approximately 129,000 individuals.

43.     The walrus is an ice-dependent species.  Walruses require sea ice as a platform for resting between foraging bouts, courtship, giving birth, nursing calves, and passive transport to new foraging areas.  In addition to providing the substrate for critical life-cycle activities, sea ice provides isolation from terrestrial predators and disturbances, proximity to food resources over the shelf, and increased space and reduced competition for haulout sites.

44.     Walruses undergo a complex seasonal migration between the Bering and

15

Chukchi seas that is strongly associated with the distribution of sea ice. The timing and pattern of onset of seasonal ice provide environmental cues for the entire walrus population to migrate. During the winter reproductive season, the population congregates on the broken pack ice of the Bering Sea. During spring many male and almost all female and young walruses follow the retreating sea ice northward and spend the summer on the sea-ice edge of the Chukchi Sea, historically using offshore ice floes as platforms for resting and nursing.

45.     The walrus is facing an uncertain future as global warming melts its sea-ice habitat. The loss of summer sea ice in the Chukchi Sea already is having significant impacts on walruses, and the effects are expected to continue. The loss of summer sea ice affects walrus access to large portions of their foraging habitat on the shallow Chukchi Sea shelf. Walruses generally utilize sea ice as a platform from which to forage, and they are usually found in waters no more than 100 meters deep. As sea ice retreats beyond the continental shelf to deeper waters and away from rich foraging grounds, walruses abandon the ice. The presence of ice over appropriate depths for feeding is especially important for females with dependent calves that are not capable of deep diving or long exposure in the water.

46.     In recent years, tens of thousands of walruses have been forced to haul out on land during the summer months when sea ice has retreated well beyond the continental shelf. Since the fall of 2007, large aggregations of walruses, numbering in the tens of thousands, have been observed along the Alaska coast. As more walruses use coastal haulouts more frequently and for longer periods each year, the prey base is reduced near the haulout areas. Malnourished walruses have been reported from Russia and observed in Alaska. Walruses hauled out on shore also are vulnerable to disturbance from noise, susceptible to predation, and subject to injury and death from stampedes, particularly in coastal haulouts. In September, 2014, an aggregation of

about 35,000 walruses formed on the Chukchi Sea coast near the village of Point Lay.

47.     Walruses experience increased physiological stress due to the loss of sea-ice, since this prevents them from resting at sea close to their food sources and from nursing their young on safe offshore sea-ice floes.  The reduction and thinning of sea ice results in higher energetic costs for walruses because they have to swim farther to find adequate foraging grounds, usually from coastal haulouts, and remain in the water longer without resting. Increased physiological stress from these causes likely have negative consequences for walrus fecundity and/or survival.  In addition, calves are at increased risk of mortality from abandonment and trampling injuries during disturbance events.

48.     Walruses that are forced to concentrate at terrestrial haulouts due to loss of sea ice are also at increased risk of predation by polar bears and disturbance by human activities. The break-up of the sea ice may increase predation opportunities for killer whales.  The disappearance of seasonal and perennial sea ice in the Arctic increases the opportunity for human activity to affect walruses, exposing them to increased shipping activity, commercial fisheries, and oil and gas exploration in various parts of their range.

**III.     The Hanna Shoal**

49.     The Hanna Shoal is a shallow area of the Chukchi Sea beginning about 75 miles off the coast of the village of Wainwright.  The area is an important feeding ground for walruses because of its shallow waters and high benthic biomass.  The Fish and Wildlife Service has identified the shoal as a "critical foraging area for the Pacific walrus in summer and fall." 78 Fed. Reg. at 35,371.

50.     In summer, walruses historically gathered in the area when sea ice lingered over the shoal, using the ice as a platform to rest, rear their calves, and forage for bottom-dwelling

organisms in the shallow shelf waters.  In recent years, sea ice over the shoal has melted or retreated to deeper waters.  However, large numbers of walruses, sometimes tens of thousands of them, continue to use the Hanna Shoal for feeding.  *Id*.  The Fish and Wildlife Service delineated an area of concentrated walrus use on and around the Hanna Shoal totaling about 9,500 square miles (the Hanna Shoal area).  *Id*.  It concluded "[i]n the Hanna Shoal area, we can reliably predict that many walruses will likely remain even after the ice melts for foraging purposes." *Id*. at 35,394.  This is because, "beginning in 2007 a new pattern of walrus distribution and movements has emerged."  EA at 73.  In the face of shrinking ice cover, walruses now congregate in large numbers on the Chukchi Sea coast.  In recent years, walruses have congregated in large numbers on a barrier island about 4 miles (~6.5 km) north of the community of Point Lay.  Because food is scarce at these coastal haulouts, walruses commute many miles from the coastal haulouts to the food-rich Hanna Shoal area to forage, notwithstanding the absence of solid ice there.  The Fish and Wildlife Service stated that "[g]iven this observed behavior, we expect that the density of walruses in the [Hanna Shoal area] could be relatively high compared with other offshore regions, even during periods of minimal sea ice cover." 78 Fed. Reg. at 35,398.

### IV.    The Impacts of Oil and Gas Activities on Walruses in the Chukchi Sea

51.    There currently is no oil production in federal or state waters and no permanent oil-industry infrastructure in the Chukchi Sea.  However, a number of large-scale industrial oil and gas exploration activities are anticipated to occur in the five years covered by the regulation. These include exploration drilling, seismic surveying, and associated support aircraft and vessel activities.  In addition to other disturbances, the Fish and Wildlife Service estimates there could be two simultaneous large-scale seismic surveys per year, each accompanied by one to three

support vessels and helicopter flights.  The Fish and Wildlife Service estimates there may be up to three to eight exploration wells drilled by up to three operators per year.

52.     Walruses can be affected adversely by all stages of oil and gas development. These effects range from disturbance and injury from the deafening sounds generated by pre-lease and on-lease seismic surveys, to disturbance and the risks of oil spills associated with exploratory drilling, and loss of sea ice due to the black carbon emitted from oil operations.  Vessels, fixed-winged aircraft, and helicopters used in oil and gas activities can trigger deadly stampedes, particularly when walruses are hauled out on land.

53.     The Fish and Wildlife Service described the potential effects of oil and gas exploration activities, stating:

> [Oil and gas exploration] activities could disturb walruses. Walruses that are disturbed may experience insufficient rest, increased stress and energy expenditure, interference with feeding, and masking of communication.  Cows with calves that experience disturbance may alter their care of calves, such as staying in the water longer or nursing less frequently.  Calves that experience disturbance could spend an increased amount of time in the water, affecting their thermoregulation.  Prolonged or repeated disturbances could potentially displace individuals or herds from preferred feeding or resting areas.  Disturbance events could cause walrus groups to abandon land or ice haulouts.

78 Fed. Reg. at 35,380-81.

54.     Several types of seismic surveys are used in offshore oil and gas exploration, including marine streamer 3D seismic surveys, ocean bottom cable 3D seismic surveys, marine streamer 2D seismic surveys, and high resolution shallow-hazard and site-clearance surveys. Seismic surveying uses airgun arrays that generate the loudest human-made noise in the oceans other than explosions.  During operations, these airguns fire and generate a sound pulse once every seven to fifteen seconds.  The noise generated by seismic airguns can propagate long

distances in water. It can be detected by underwater hydrophones several thousand kilometers from the airguns that generate the noise.

55. When promulgating the Chukchi Sea incidental take regulation, the Fish and Wildlife Service acknowledged that "[s]eismic operations are expected to add significant levels of noise into the marine environment," and "walruses found near source levels within the 180-decibel (dB re 1 μPa at 1m) ensonification zone described by Industry for seismic activities could potentially suffer shifts in hearing thresholds and temporary hearing loss." 78 Fed. Reg. at 35,381.

56. Exploration drilling under the regulation could also involve loud underwater sounds from drilling, dynamic positioning of vessels, excavating mud-lined cellars, ice breaking, and associated seismic surveying. These sounds also can affect walruses adversely. For example, ice management operations typically require vessels to accelerate, reverse direction, and turn rapidly, activities that maximize propeller cavitation and resulting noise levels. Icebreaking activities can displace some walrus groups up to several miles away.

57. Drilling-associated vessel and aircraft activity also can disturb walruses. Vessels and aircraft can cause walruses to abandon haulouts, potentially trampling young, and to abandon altogether areas of industry activity. The Fish and Wildlife Service acknowledged that industry disturbance associated with exploration "potentially [can] obstruct migratory pathways and interfere with the free movements of animals." EA at 73. It acknowledged that "the potential for disturbance events resulting in injuries, mortalities, or cow-calf separations is of concern." 78 Fed. Reg. at 35,382. In 2007, more than 3,000 walrus calves died along the Russian Chukotka coast due to stampedes caused by humans and polar bears.

58.    Exploration drilling also risks oil spills, and the Fish and Wildlife Service acknowledged, "[t]he potential impacts to Pacific walruses from a spill could be significant, particularly if subsequent cleanup efforts are ineffective."  78 Fed. Reg. at 35,387.  The Fish and Wildlife Service has acknowledged that there are no effective strategies for cleaning up oil in the Arctic Ocean, especially in the broken-ice conditions that historically characterize walrus habitat.

59.    Oil industry activities have the largest chance of causing harm to walruses when they encounter groups of animals, particularly mothers and calves.  Accordingly, the Fish and Wildlife Service has concluded it is critical to minimize disturbance from oil industry activities to aggregations of walruses.  The oil industry repeatedly has encountered large groups of walruses during its past operations in the Chukchi Sea.  For example, Shell Oil reported that the occurrence of walruses at its "Burger" prospect near the Hanna Shoal is regular and common.  During its Chukchi Sea drilling operations at the prospect in 2012, Shell Oil reported 338 sightings of a total of 8,678 walruses.  Many sightings were of large groups of walruses, sometimes as many as 200 or 300 individuals.

**V.    The Chukchi Sea Incidental Take Regulation**

60.    On January 9, 2013, the Fish and Wildlife Service published a proposed regulation pursuant to the MMPA to authorize the harassment of polar bears and Pacific walruses resulting from any oil and gas industry pre-leasing, leasing, and exploration activities in the Chukchi Sea and adjacent coastal areas of Alaska for five years.  *See* 78 Fed. Reg. 1942 (Jan. 9, 2013).  On June 12, 2013, the Fish and Wildlife Service finalized the regulation.  *See* Marine Mammals; Incidental Take During Specified Activities, 78 Fed. Reg. 35,364 (June 12, 2013) (codified at 50 C.F.R. §§ 18.111-18.119).

61.    This incidental take regulation permits walruses to be harmed during exploration

activities associated with oil and gas operations in the Chukchi Sea and adjacent coastline, including seismic exploration, offshore drilling, and use of ice-breakers, airplanes, and helicopters. The regulation covers activities throughout the Chukchi Sea, including the Hanna Shoal area. It imposes mitigation measures on oil and gas operations intended to reduce the take of walruses during oil and gas activities. These mitigation measures include, subject to variances issued by the Fish and Wildlife Service on a case-by-case basis, requirements that vessels avoid approaching groups of walruses observed in the water or hauled out on land or ice, separation standards from groups of walruses on ice or land for fixed wing aircraft and from walrus groups on land for helicopters, and monitoring procedures and measures designed to reduce exposure of walruses to extremely high sound levels from seismic surveys.

62. The Fish and Wildlife Service concluded at the time it promulgated the regulation that only small numbers of walruses would be taken with a negligible impact by the activities covered by the regulation and that the mitigation measures identified in the regulation ensure the least practicable adverse impact from oil and gas exploration activities to walruses and their habitat. However, it also concluded that the Hanna Shoal is a "critical foraging area" and an "area of highly concentrated use [by walruses] during July through September," and that "large numbers of walruses [ ] could be encountered" there, "at times reaching numbers of tens of thousands," during that time. 78 Fed. Reg. at 35,371. It concluded that additional mitigation measures may be necessary to "minimize potential disturbance and ensure consistency with the MMPA mandates that only small numbers of walruses be affected with a negligible impact on the stock" by industry activity in the area. *Id.* It also concluded that it is "critical to minimize disturbance to walruses" in the Hanna Shoal area. *Id.* However, it did not conduct an analysis of the impacts of oil and gas activities on walruses in, or traveling to and from, the Hanna Shoal

area or identify and impose additional mitigation measures when it promulgated the regulation. It deferred these analyses to the LOA stage, stating "[o]n a case-by-case basis, as individual LOA applications are received, we will examine the proposed activities in light of the boundaries of the [Hanna Shoal area], the nature and timing of the proposed activities, and other available information at the time." *Id.* The Fish and Wildlife Service makes the decision whether to issue an LOA allowing activities to proceed under the regulation without public process.

63.     The Marine Mammal Commission submitted comments on the proposed incidental take regulation.  It recommended that the Fish and Wildlife Service specify in its regulation mitigation measures that would be required for drilling operations and other activities. It recommended that the regulation include a prohibition on all oil and gas activities in the Hanna Shoal area and include provisions for seasonal restrictions on oil and gas operations and support activities near coastal haul-out areas and in the travel corridor between Hanna Shoal and those areas.

64.     Subsequent to the promulgation of the incidental take regulation, the Fish and Wildlife Service has issued letters of authorization to, at a minimum, Olgoonik Fairweather, LLC, Shell Offshore, Inc., and TGS-NOPEC Geophysical Company.  It has issued letters of authorization authorizing activities in the Hanna Shoal area to, at a minimum, Shell Offshore, Inc. and TGS-NOPEC.  The Fish and Wildlife Service issued these LOAs without engaging in a public process or additional NEPA evaluation.  It took over seven months after issuing the LOAs to publish a notice of these LOAs in the Federal Register.  79 Fed. Reg. 17,564 (March 28, 2014).

65.     Shell Gulf of Mexico Inc. has submitted a revised draft exploration plan for drilling in the Chukchi Sea commencing as soon as July, 2015.  It states in the exploration plan

23

that it will apply for a letter of authorization from the Fish and Wildlife Service to take walruses incidental to its operations. It states it will apply to acquire a variance from the Fish and Wildlife Service to allow vessels to enter into the Hanna Shoal area.

## VI. The NEPA Process

66. On October 17, 2012, the Fish and Wildlife Service published a draft EA that purported to describe the environmental impacts of the incidental take regulation. On May 14, 2013, the Fish and Wildlife Service finalized the EA.

67. In the EA, the Fish and Wildlife Service determined that oil and gas operations could result in disturbances to walruses, leading to "insufficient rest, increased stress and energy expenditure, interference with feeding, the masking of sounds for communication, and hypothermia in calves that spend too much time in the water." EA at 72. "Prolonged or repeated disturbances could displace individuals or herds from preferred feeding or resting areas." *Id.* The disturbances could result in "animal injuries, mortalities, or cow-calf separations." EA at 76. "[P]otential injuries increase with the size of affected walrus aggregations." *Id.* "The potential impacts to Pacific walruses from a spill could be significant, particularly if subsequent cleanup efforts were ineffective." EA at 82.

68. The Fish and Wildlife Service concluded in the EA that "it is critical to minimize disturbance to walruses in [the Hanna Shoal] area of highly concentrated use during July through September," and "that additional mitigation measures, such as seasonal restrictions, reduced vessel traffic, or rerouting vessels, may be necessary for activities within the [Hanna Shoal area] to minimize potential disturbance and ensure consistency with the MMPA mandates that only small numbers of walruses be affected with a negligible impact on the stock." EA at 27.

69. The Fish and Wildlife Service concluded in the EA that oil and gas operations

that "intersect travel corridors between haulouts and the [Hanna Shoal area] may require close monitoring and additional special mitigation procedures, such as seasonal restrictions (e.g., July to September) of Industry activities from Hanna Shoal and rerouting vessel traffic and aircraft flights around walrus travel corridors." EA at 75.

70. The Fish and Wildlife Service did not analyze the impacts of oil and gas operations in the Hanna Shoal area and in travel corridors but stated in the EA that it will determine at the LOA stage on a case-by-case basis whether activity proposed for the Hanna Shoal area "is likely to negatively impact more than small numbers of walruses." EA at 27-28.

71. Despite the concerns it raised in the EA and its deferral of analysis of the impacts of oil industry operations in the Hanna Shoal area and in travel corridors between haulouts and the shoal, the Fish and Wildlife Service on May 16, 2013, signed a finding of no significant impact, concluding that the decision to promulgate the incidental take regulation does not significantly affect the quality of the human environment.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Violation of the Administrative Procedure Act, 5 U.S.C. §§ 702 *et seq.*, and Marine Mammal Protection Act, 16 U.S.C. § 1361 *et seq.*)**

72. Plaintiffs incorporate each and every allegation set forth in the Complaint by reference.

73. The MMPA provides that the Fish and Wildlife Service may allow the incidental take of marine mammals by regulation, but only of small numbers, with negligible impacts on the population, and after specifying, among other things, means of effecting the least practicable adverse impact on the species and its habitat, after notice and an opportunity for public comment. 16 U.S.C. § 1371(a)(5)(A).

74. In promulgating the incidental take regulation described above, the Fish and Wildlife Service concluded that oil and gas exploration activities covered by the regulation would take only a small number of walruses with negligible impact on the population and that the mitigation and monitoring measures contained in the regulation ensured the least practicable adverse impact to walruses and their habitat from oil and gas operations under the regulation.

75. The incidental take regulation covers oil and gas exploration activities throughout the Chukchi Sea region, including the Hanna Shoal area. In adopting the regulation, the Fish and Wildlife Service concluded that additional mitigation and monitoring measures may be necessary to ensure that oil and gas activities in the Hanna Shoal area take only a small number of walruses and have no more than a negligible impact on the walrus population. However, it deferred analysis of, and imposition of additional mitigation measures on, oil and gas activities in the Hanna Shoal to a later, non-public LOA process. In approving the incidental take regulation based on these significant errors, the Fish and Wildlife Service acted arbitrarily and in violation of its obligations under the MMPA and the APA.

**SECOND CLAIM FOR RELIEF**
**(Violation of the Administrative Procedure Act, 5 U.S.C. §§ 702-706, and the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f)**

76. Plaintiffs incorporate each and every allegation set forth in the Complaint by reference.

77. NEPA requires a federal agency to prepare an EIS for a proposed agency action that may have a significant effect on the environment. *See* 42 U.S.C. § 4332(2)(C). An agency may first prepare a less detailed environmental assessment to determine whether the project may affect the environment significantly and requires a full EIS. *Id.*; 40 C.F.R. § 1508.9. An EA must take a hard look at the potential environmental impacts of a proposed agency action,

evaluating all important aspects of such impacts. If, after preparation of an EA, substantial questions persist whether the proposed action will have significant environmental effects, an agency must prepare an EIS. Any finding of no significant impact, excusing preparation of a full EIS, must provide a convincing statement of reasons that reflects a reasoned decision, based on the facts found, that the project's impacts are insignificant. 40 C.F.R. §§ 1501.4, 1508.9 & 1508.13.

78. The Fish and Wildlife Service prepared an EA and signed a finding of no significant impact, concluding that the decision to promulgate the incidental take regulation described above would not affect the quality of the human environment significantly. Based on its finding of no significant impact, the Fish and Wildlife Service did not prepare an EIS for the regulation.

79. The Fish and Wildlife Service concluded in the EA that it is "critical to minimize disturbance to walruses in [the Hanna Shoal] area of highly concentrated use during July through September" from oil and gas exploration activities. The Fish and Wildlife Service also concluded that additional mitigation measures, not determined in the regulation, could be necessary to minimize disturbance to walruses and ensure only a negligible impact on small numbers of the population.

80. The Fish and Wildlife Service EA for the Chukchi Sea walrus incidental take regulation and the agency's finding of no significant impact both fail to take account of the potential impacts to walruses from oil and gas exploration in the Hanna Shoal area, absent mitigation measures not determined in the incidental take regulation. These errors render the EA and finding of no significant impact arbitrary, capricious, and not in accordance with law. *See* 42 U.S.C. § 4332; 40 C.F.R. §§ 1500-1508; 5 U.S.C. §§ 702, 706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment providing the following relief:

1. Declare that Defendants have violated the MMPA, NEPA, and the APA and that the actions as set forth above are arbitrary, capricious, and not in accordance with law;

2. Set aside the incidental take regulation, 78 Fed. Reg. 35,364 (June 12, 2013) (codified at 50 C.F.R. §§ 18.111-18.119);

3. Enter appropriate injunctive relief;

4. Award Plaintiffs the costs of this action, including reasonable attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

5. Grant such other relief as the Court deems just and proper.

Respectfully submitted this 10th day of November, 2014.

*s/ Eric P. Jorgensen*
Eric P. Jorgensen (D.C. Bar No. 88897)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801-1145
T: 907.586.2751
E: ejorgensen@earthjustice.org

*s/ Erik Grafe*
Erik Grafe (Alaska Bar No. 0804010) (*pro hac vice* pending)
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102
E: egrafe@earthjustice.org

*Attorneys for Plaintiffs Alaska Wilderness League; Center for Biological Diversity; Greenpeace, Inc.; Resisting Environmental Destruction on Indigenous Lands; and Sierra Club*

*s/ Aaron Colangelo*

Aaron Colangelo (D.C. Bar No. 468448)
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, D.C. 20005
T: 202.289.2376
E: acolangelo@nrdc.org

*s/ Nathaniel S.W. Lawrence*

Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (*pro hac vice*
pending*)*
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*