UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ALASKA WILDERNESS LEAGUE, et al.,

    Plaintiffs,

    v.

SALLY JEWELL, in her official capacity
as Secretary of the Interior, et al.,

    Defendants.

Civil Action No. 14-1886 (JDB)

## MEMORANDUM OPINION

There are no Pacific walruses in Washington, D.C.—not even at the National Zoo. See Meet Our Animals: Mammals at the National Zoo, Smithsonian Nat'l Zoological Park, http://nationalzoo.si.edu/Animals/AnimalIndex/mammals.cfm. And yet this case is about Pacific walruses. Plaintiff Alaska Wilderness League and other environmental groups brought the case to challenge a United States Fish and Wildlife Service regulation that allows certain oil and gas industry players to unintentionally "take" (that is to say, harm, harass, or disturb—but not kill) Pacific walruses in the Chukchi Sea off the coast of Alaska. See Compl. ¶ 1. But the government has responded with a preliminary question: is the District Court for the District of Alaska better positioned to weigh the merits of these Alaska-centric claims? See Gov't's Mot. to Transfer Venue [ECF No. 8] ("Gov't's Mot.").[1] The answer is yes, in this Court's estimation. The Court will therefore grant the government's motion and transfer this case to Alaska, where the case could have been filed from the start, where the challenged regulation was initiated and developed, where that regulation will apply, and—not inconsequentially—where Pacific walruses can be found.

---

[1] See also Pls.' Opp'n to Gov't's Mot. [ECF No. 14] ("Pls.' Opp'n"); Gov't's Reply to Pls.' Opp'n [ECF No. 18] ("Gov't's Reply"); Joint Mot. to Expedite Consideration of Gov't's Mot. [ECF No. 24] ("Joint Mot.").

1

## BACKGROUND

The Marine Mammal Protection Act generally prohibits "the taking . . . of marine mammals [including walruses] and marine mammal products."[2] 16 U.S.C. § 1371(a). But there are exceptions to this general rule. One exception: citizens of the United States "who engage in a specified activity . . . within a specified geographical region" may request authorization for "incidental, but not intentional, taking . . . of small numbers of marine mammals" for a period of "not more than five consecutive years." Id. § 1371(a)(5)(A)(i). And according to the Act, some requests under this exception must be approved: "the Secretary [of the Interior] shall allow" incidental taking where she determines—after "notice . . . and [an] opportunity for public comment"—"that the total of such taking . . . will have a negligible impact on such [marine mammals] and will not have an unmitigable adverse impact on the availability of such [mammals] . . . for subsistence uses" by Alaskan natives. Id. (emphasis added); see also id. § 1371(b) (authorizing takings by certain Indians, Aleuts, or Eskimos).

This case stems from the Secretary's approval of one such incidental-take request by the Alaska Oil and Gas Association. On January 31, 2012, the Association called for a regulation that would "allow the nonlethal, incidental take of small numbers of walruses . . . in the Chukchi Sea and the adjacent western coast of Alaska . . . for a period of five years (from June 11, 2013, to June 11, 2018)." Gov't's Mot. at 5. About a year later, the Fish and Wildlife Service proposed a regulation along the lines of that requested by the Association. See Compl. ¶ 60 (citing 78 Fed.

---

[2] The Marine Mammal Protection Act defines "take" broadly; it means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13). The Act also allows the Secretary of the Interior to more narrowly define what constitutes permissible taking in certain situations. See id. § 1371(a)(5)(A)(i)(II) (authorizing the Secretary to "prescribe[] regulations setting forth . . . permissible methods of taking"). The Fish and Wildlife Service exercised that prerogative here, and thus "permissible . . . taking" (as used in this case) carries a narrow construction—it expressly does not include the "[i]ntentional take [or] lethal incidental take of walruses." 50 C.F.R. § 18.117(a).

2

Reg. 1942 (Jan. 9, 2013)). And after a six-month notice-and-comment period, the Service issued its final regulation on June 12, 2013. See id. (citing 50 C.F.R. §§ 18.111–18.119).

By its terms, the regulation allows "the nonlethal incidental . . . take of small numbers of Pacific walruses . . . by [citizens] . . . engaged in oil and gas exploration activities" in the specified region. 50 C.F.R. § 18.111. This is no small area. The regulation applies to a geographic area covering approximately 90,000 square miles, and including portions of the Outer Continental Shelf, waters of the State of Alaska, and "terrestrial coastal land [extending] 25 miles inland" around Wainwright and Barrow, Alaska. Id. § 18.112; see also Gov't's Mot. at 5. Any oil and gas explorers operating in this region and hoping to take advantage of the regulation "must apply for a Letter of Authorization for each exploration activity." 50 C.F.R. § 18.114(b). The application must include, among other things, a plan for monitoring and mitigating any effects on walruses, as well as "[a] site-specific . . . walrus awareness and interaction plan" meant to "limit animal–human interactions, increase site safety, and minimize impacts to marine mammals." Id. § 18.114(c). Only those explorers with approved Letters of Authorization will be forgiven their incidental taking of Pacific walruses. See id. § 18.116.

Some seventeen months after the Fish and Wildlife Service promulgated its final regulation, the Alaska Wilderness League filed this action. See Compl. at 29 (noting that plaintiff submitted its complaint on November 10, 2014). The complaint alleges two grounds for relief—both of which invoke the Administrative Procedure Act. First, the League claims that "the Fish and Wildlife Service acted arbitrarily and in violation of its obligations" when it approved the Pacific walrus incidental-take regulation. Id. ¶ 75. And second, the League claims that the Service's negligible-impact conclusion regarding this regulation was "arbitrary, capricious, and not in accordance with law." Id. ¶ 80. The Service, for its part, denies these assertions, and has

moved to transfer this case to the District of Alaska. See Gov't's Answer to Compl. [ECF No. 19] at 19; Gov't's Mot. at 2.

## LEGAL STANDARD

Although the Alaska Wilderness League is anxious to wade into the merits of its Administrative Procedure Act claims, see, e.g., Joint Mot. at 1 ("Plaintiffs hope the summary judgment briefing can be completed well in advance of [July 1]."), the Court must first address a different question: should this case be transferred? As the law governing transfers explains: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought." 28 U.S.C. § 1404(a). The statute thus asks two things of courts considering transfers. First, this Court must decide whether plaintiffs could have brought their case in the proposed transferee district. See Van Dusen v. Barrack, 376 U.S. 612, 622 (1964). And second, the Court must exercise its "discretion . . . to adjudicate [the] motion[] for transfer according to an individualized, case-by-case consideration of convenience and fairness." Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (internal quotation marks omitted). This discretion is not entirely unfettered, however. The courts in this Circuit will consider a number of "public" and "private" interests in making their transfer decisions, and it is the movant's burden to establish that the various factors line up in favor of transfer. See, e.g., Trout Unlimited v. U.S. Dep't of Ag., 944 F. Supp. 13, 16 (D.D.C. 1996).

## DISCUSSION

Here, the Fish and Wildlife Service has fully satisfied its burden. First, venue is undeniably proper in the District of Alaska. Second, the relevant public-interest factors weigh in favor of transfer. And third, the private-interest factors likewise convince the Court that transfer is the most appropriate course in this case. The Court will discuss each of these conclusions in turn.

4

## I. VENUE

Start with venue. Civil actions like this one against a federal government agency or official may be heard in any district where, among other things, "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or . . . the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). The Alaska Wilderness League does not contest that the District of Alaska fits this description, see Pls.' Opp'n at 10 n.5 ("There is no dispute that plaintiffs could have filed this action in the U.S. District Court for the District of Alaska.")—and for good reason. For one thing, the Fish and Wildlife Service drafted and approved the regulation at the center of this case in its Anchorage, Alaska office; indeed, "all of the substantive work leading to the publication of the Final Rule was done in Alaska." Decl. of Deborah Williams [ECF No. 8-1] ("Williams Decl.") at 3 (emphasis added). For another, several of the plaintiffs in this case—which is not a real property dispute—are residents of the State of Alaska. See, e.g., Compl. ¶ 12 (describing the Alaska Wilderness League's four-person Alaska office). The government has therefore cleared its first transfer hurdle: this Court is convinced that the League could have filed its complaint in the first instance in the District of Alaska.

## II. PUBLIC-INTEREST FACTORS

The second hurdle is no obstacle either, because the government has shown that the relevant public-interest factors warrant the transfer of this case to Alaska. Depending on the particulars of a given case, courts will consider such factors as "(1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home." Trout

Unlimited, 944 F. Supp. at 16. Here, these factors either strongly favor transfer to Alaska or are neutral to the transfer analysis.

The Court begins at the end of the list. "[P]erhaps the most important factor" in the motion-to-transfer balancing test is the interest in having local controversies decided locally. Pres. Soc. of Charleston v. U.S. Army Corps of Eng'rs, 893 F. Supp. 2d 49, 54 (D.D.C. 2012); see also Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 509 (1947) ("In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only."); Adams v. Bell, 711 F.2d 161, 167 n.34 (D.C. Cir. 1983) (courts should consider "those whose rights and interests are in fact most vitally affected by the suit"). This consideration weighs heavily in favor of transfer here; indeed, the controversy looks "local" at every turn. Consider the regulation: it governs only activities in the Chukchi Sea around (and within) Alaska's sovereign territory. Consider those regulated: the regulation applies only to oil and gas explorers operating in and around Alaska. And consider the regulation's subject: it relates only to the incidental take of Pacific walruses, a species whose "entire population" inhabits the waters and shores surrounding Alaska. Compl. ¶ 3. Faced with these facts, the Court can only conclude that "the District of [Alaska] possesses a significant and predominant interest in this suit given the impact its resolution will have upon the affected lands, wildlife, and people of that district." W. Watersheds Project v. Pool, 942 F. Supp. 2d 93, 102 (D.D.C. 2013) (internal quotation marks omitted).

The other two public-interest factors cannot counterbalance this tilt towards transfer. The general rule is that all federal courts are "competent to decide federal issues correctly," In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1175 (D.C. Cir. 1987) (internal quotation marks omitted), and the parties do not contest application of that general rule here. This

factor is therefore neutral regarding transfer.³  See Nat'l Wildlife Fed'n v. Harvey, 437 F. Supp. 2d 42, 49 (D.D.C. 2006) ("[B]oth courts are competent to interpret the federal statutes involved in this case, and there is no reason to transfer or not transfer based on this factor.").  The same goes for the relative congestion of the two courts' dockets.  Each judge in the two courts hears a similar number of civil cases (105 per judge in Alaska; 148 per judge in the District of Columbia), and—on average—these courts resolve civil cases in a similar amount of time (8.5 months in Alaska; 7.6 months in the District of Columbia).  See Ex. 2 to Gov't's Mot. [ECF No. 8-2] at 3–4.  "Absent a showing that either court's docket is substantially more congested than the other, this factor weighs neither for nor against transfer."  Pres. Soc., 893 F. Supp. 2d at 57 (emphasis added) (internal quotation marks omitted).  Hence, the full public-interest calculation yields two neutral factors and one factor (the "most important" factor) that strongly favors transfer.

The Alaska Wilderness League does its utmost to shift the balance, but to no avail.  First, the League contends that this is not a local controversy at all, but a national one.  It reasons that the incidental-take regulation covers some 90,000 square miles (much of which is federal, not Alaskan, territory), and that the oil and gas exploration activities the regulation governs are connected to a national concern (namely, "the plight of the warming Arctic Ocean").  Pls.' Opp'n at 15.  Fair enough.  But there is no "blanket rule that 'national policy' cases should be brought" in the District of Columbia; such controversies, instead, must undergo the usual "case-by-case determination" mandated by the transfer statute.  Starnes v. McGuire, 512 F.2d 918, 928 (D.C. Cir. 1974).  Moreover, even accepting that this case touches upon some national concerns, it is beyond cavil that the regulation most directly affects Alaskan lands, livelihoods, waters, and

---

³ The Court notes, however, that the District of Alaska appears to have specific familiarity with previous challenges to the Fish and Wildlife Service's incidental-take regulations.  See, e.g., Ctr. for Biological Diversity v. Salazar, 695 F.3d 893, 898 (9th Cir. 2012) (affirming District of Alaska's grant of summary judgment in favor of the Fish and Wildlife Service).

7

wildlife. Thus, "[t]he implications of a decision resolving this dispute will be felt most acutely in [Alaska] . . . and therefore the local interest in this case outweighs the national interest." W. Watersheds Project, 942 F. Supp. 2d at 103; see also, e.g., Harvey, 437 F. Supp. 2d at 49–50 (finding that Everglades' location in Florida and its impact on local ecosystems and people outweighed the national interest in the natural beauty of the area).

In a similar vein, the Alaska Wilderness League argues that the Pacific walrus is a "federally protected species" whose cause warrants national—not just local—attention. Pls.' Opp'n at 16. Again, fair enough. But why is a federal district court in the District of Columbia any better equipped to protect the Pacific walrus than is a federal district court in Alaska? Surely it cannot be this Court's familiarity with walruses—for it has none worthy of mention. The District of Alaska, by contrast, has significant (and recent) experience weighing the federal government's interest in the protection of walruses against other priorities established by Congress. See, e.g., Salazar, 695 F.3d at 893; Ctr. for Biological Diversity v. Kempthorne, 588 F.3d 701, 712 (9th Cir. 2009) (affirming District of Alaska's judgment regarding walrus incidental-take regulations); Native Village of Chickaloon v. Nat'l Marine Fisheries Serv., 947 F. Supp. 2d 1031, 1049–53 (D. Alaska 2013) (examining effect of seismic surveys on marine mammals). Alaska's federal court therefore remains the most appropriate forum for this Pacific walrus case.

The Alaska Wilderness League's case law does not change this analysis. It points to Oceana v. Bureau of Ocean Energy Management, 962 F. Supp. 2d 70 (D.D.C. 2013), and Wilderness Society v. Babbitt, 104 F. Supp. 2d 10 (D.D.C. 2000), for the proposition that "large-scale federal decisions regarding where America sources its oil and gas . . . are precisely the kind of national issues that counsel against transfer of venue." Pls.' Opp'n at 17. But there are several problems with this argument. For starters, the instant case—which concerns only the incidental-

take of Pacific walruses—is more than a few steps removed from the national issue of how, where, or when America gets its oil and gas. See 78 Fed. Reg. at 35,365 ("These regulations do not authorize, or 'permit,' the actual activities associated with oil and gas exploration, e.g., seismic testing, drilling, or sea floor mapping."). Moreover, neither Oceana nor Wilderness Society control this case; they are simply too different to be persuasive. In Oceana, defendants sought transfer to Alabama despite the fact that the government action at issue involved drilling platforms off the coast of three different states that directly affected the entire Gulf Coast region. See 962 F. Supp. 2d at 76. That is not the situation here, where the incidental-take regulation affects just one state: Alaska. Wilderness Society is no better for plaintiffs. That case involved government regulations concerning exclusively federal lands (the National Petroleum Reserve) that happened to be in Alaska, not—as here—federal waters as well as "lands [and waters] controlled by the State of Alaska." Wilderness Society, 104 F. Supp. 2d at 17. The Court thus remains convinced that this case is sufficiently local to merit transfer.

Finally, the Alaska Wilderness League focuses on a court-congestion issue, pointing out that the District of Alaska tends to take an extra month (nine-tenths of a month, to be exact) to dispose of civil cases on its docket. Pls.' Opp'n at 14. But this is unconvincing, for several reasons. First, the case law is clear that only "substantial[]" congestion differences will tip the transfer balance, Pres. Soc., 893 F. Supp. 2d at 57 (internal quotation marks omitted), and a difference of (less than) one month cannot be called that, see Johnson v. VGC Holding Corp., 767 F. Supp. 2d 208, 217 (D. Maine 2011) (docket congestion is "neutral" where difference between courts was less than a month). Second, another metric for congestion is to compare "the average number of cases pending per judgeship on each court," W. Watersheds Proj., 942 F. Supp. 2d at 101–02 (emphasis omitted), and by that measure the District of Alaska is actually less congested than this

9

Court (105 cases per judge in Alaska versus 148 here). And third, the League cannot plausibly argue that transferring this case to the District of Alaska will cause unnecessary delay where, as here, the "case is in its earliest stages, [and thus] there would be no delay associated with the [Alaska] district court's having to familiarize itself with this case."[4] Trout Unlimited, 944 F. Supp. at 19. Despite the Alaska Wilderness League's arguments to the contrary, then, the public-interest factors still point toward transfer.

## III. PRIVATE-INTEREST FACTORS

The same is true for the various private-interest factors at play in this litigation. These considerations include "(1) the plaintiff[s'] choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; [and] (4) the convenience of the parties."[5] Trout Unlimited, 944 F. Supp. at 16 (footnotes omitted). Taken together, these factors also support the transfer of this case out of the District of Columbia and into the District of Alaska.

This time, the Court starts at the top of the list: the plaintiffs' choice of forum. To be sure, courts will generally give deference to a plaintiff's preferred place of litigation. But "[w]hen the

---

[4] The League suggests that a one-month delay in this case could prove significant, because the oil "industry [might] attempt[] to utilize the incidental take regulation next summer." Pls.' Opp'n at 14. But even setting aside the speculative nature of this argument, this possibility alone does not transform a de minimis one-month delay into a substantial delay in the motion-to-transfer context. Moreover, if plaintiffs are concerned about the implementation of this incidental-take regulation before a court can resolve the merits of their claims, the proper course is not to rush the summary-judgment process—but to file a motion for a preliminary injunction (or, if it comes to it, a temporary restraining order) that will "preserve the status quo pending the resolution of the underlying litigation." Abdullah v. Bush, 945 F. Supp. 2d 64, 67 (D.D.C. 2013).

[5] Trout Unlimited offers two additional considerations: "(5) the convenience of the witnesses of the plaintiff and defendant, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof." 944 F. Supp. at 16 (footnotes omitted). But the parties do not raise any arguments specific to these factors; indeed, they both agree that these factors are neutral in the transfer balancing act. Compare Gov't's Mot. at 15 ("[C]onvenience of parties and witnesses and ease of access to evidence[] are secondary.") with Pls.' Opp'n at 12 ("[T]he location of neither the record nor witnesses is relevant to forum choice."). Neither factor is particularly relevant to this case, which "involves judicial review of an administrative decision and accordingly . . . neither discovery, witnesses, nor a trial will be required. Rather, judicial review will be limited to the administrative record." Trout Unlimited, 944 F. Supp. at 18 (footnote omitted). Thus, the Court will not linger on these decidedly neutral factors.

connection between the controversy, the plaintiff, and the chosen forum is attenuated, the court pays less deference to plaintiffs' choice of forum." Sierra Club v. Flowers, 276 F. Supp. 2d 62, 67 (D.D.C. 2003); see also Pres. Soc., 893 F. Supp. 2d at 54 ("Deference is further limited where the plaintiff's choice of forum has no meaningful ties to the controversy and no particular interest in the parties or subject matter." (internal quotation marks omitted)). "[A]ttenuated" is the key word here. As has been described, plaintiffs in this case challenge a regulation that will apply exclusively in Alaska (and waters off Alaska's coast), that will regulate oil and gas explorers in Alaska (and those same waters), and that will allow the incidental taking of small numbers of a marine mammal typically found basking on Alaska's shores. None of this has any direct connection to the District of Columbia, its environment, its wildlife, or its people; hence, any connection between this controversy and the District is—to say the least—"attenuated." The Court will therefore give little deference to the Alaska Wilderness League's forum choice.

On the other side of the coin, the Fish and Wildlife Service has proposed litigating this case in the District of Alaska, which "does have meaningful ties to the controversy." Pres. Soc., 893 F. Supp. 2d at 55 (emphasis added). The controversy in this case directly affects Alaska, and thus the district court in that state has "a strong interest in the outcome of th[is] dispute." Id. And it is equally clear that the controversy grew out of decisions made in Alaska—not in Washington, D.C. Moreover, the government has asked that this case be transferred to what could be called plaintiffs' second home. The Alaska Wilderness League might have its headquarters in Washington, D.C., but it has three different offices in Alaska, and other plaintiffs in this case similarly maintain Alaska offices. See, e.g., Compl. ¶ 13 ("Plaintiff Center for Biological Diversity is a non-profit organization with offices in Alaska."); id. ¶ 16 ("Plaintiff Resisting Environmental Destruction on Indigenous Lands . . . is a network of grassroots Alaska Natives.").

11

Thus, as between plaintiffs' choice (which gets little deference) and the government's choice, the first two private-interest factors tip toward transfer.

For similar reasons, the third factor, too, strongly supports transfer. "In cases brought under the [Administrative Procedure Act], courts generally focus on where the decisionmaking process occurred to determine where the claims arose." Nat'l Ass'n of Home Builders v. EPA, 675 F. Supp. 2d 173, 179 (D.D.C. 2009). And it is abundantly clear that the material decisions in this case came not from the Department of the Interior in Washington, D.C., but from the Fish and Wildlife Service's regional office in Alaska. As the chief of the Fish and Wildlife Service's Marine Mammals Management Program explains, "all of the substantive work leading to the publication of the [incidental-take regulation] was done in Alaska." Williams Decl. at 3 (emphasis added). Specifically, "[t]he Environmental Assessment, Proposed Rule, and Final Rule were all drafted" in Anchorage, Alaska, as were "all of the responses to the public comments" generated by the proposed incidental-take regulation. Id. And while the declaration acknowledges that "every Federal Register notice published by the Service is subject to some level of review and sign-off by Service leadership in Washington, D.C.," the declaration also explains that "in this case, those reviews did not result in any substantive changes . . . to the Final Rule." Id. at 3–4. The upshot of this unrebutted evidence: if the plaintiffs want explanations for how and why the Service issued this walrus-specific incidental-take regulation, they can look to only one place—Alaska.

Finally, the convenience of the parties "also slightly tilts toward transfer." Pres. Soc., 893 F. Supp. 2d at 56. From the Alaska Wilderness League's perspective: several of the plaintiffs have offices in Alaska, see Compl. ¶¶ 12, 13, 16; the lawyers for five of the six plaintiffs are located in Alaska, see Pls.' Opp'n at 19; and many of the plaintiffs frequently litigate in the District of Alaska, see, e.g., Pls.' Opp'n at 10 ("[P]laintiffs also have substantial contacts with and in the

12

state of Alaska and sometimes file in federal court there." (footnote omitted)).  The League and its companion organizations thus cannot reasonably claim to be inconvenienced by transfer of this case to the District of Alaska.  See, e.g., Trout Unlimited, 944 F. Supp. at 18 ("The convenience of the parties . . . supports transfer of this case to Colorado.  Two of the three plaintiffs . . . are located in Colorado.  Plaintiffs have counsel located in Colorado.").  And from the government's perspective:  it has asked to litigate in the District of Alaska, and therefore "any inconvenience to [the federal government] is offset by the fact that [it is] the party requesting the transfer."  Harvey, 437 F. Supp. 2d at 48 (internal quotation marks omitted).  In sum, then, all of the four private-interest factors at issue in this case point in the same direction—to Alaska.  That District is therefore the proper forum for airing plaintiffs' grievances.

Of course, the Alaska Wilderness League disagrees with this analysis at most every step.  First, the League argues that the Court should defer to its forum choice "because nearly all plaintiffs have significant connections to the District of Columbia"; specifically, the League is headquartered there, and four of the other five plaintiffs have offices there.  Pls.' Opp'n at 8, 9.  But "the fact that the parties . . . have offices in the District of Columbia is not dispositive of the question of deference."  Sierra Club, 276 F. Supp. 2d at 67; see also Kafack v. Primerica Life Ins. Co., 934 F. Supp. 3, 7 (D.D.C. 1996) ("Cases decided under Section 1404(a) . . . have laid much less emphasis on this [residence] factor." (internal quotation marks omitted)).  And this is especially true in cases like this one, where "the parties' presence in the District of Columbia is overshadowed by the lack of evidence that federal officials in this forum played an active or significant role in the decision to issue the [incidental-take regulation]."  Sierra Club, 276 F. Supp. 2d at 67 (internal quotation marks omitted).  The Court is thus unmoved; the League's choice of forum deserves little deference.

13

Next, the League contends that "[t]he causes of action in this case arose when [officials in Washington, D.C.] signed and promulgated the incidental take regulation." Pls.' Opp'n at 10. As the League sees things, because a Washington, D.C. official (not one in Alaska) "promulgated the incidental take regulation," this case is different from others where the district court found no substantial connection to the District of Columbia. Id. at 11 (emphasis added). But the cases make clear that signing and promulgating are not magic acts that somehow transform a transferable case into an un-transferable one. See, e.g., W. Watersheds Proj., 942 F. Supp. 2d at 98 ("A plaintiff seeking to sue federal defendants in Washington, D.C. must . . . demonstrate some substantial personalized involvement by a member of the Washington, D.C. agency before the court can conclude that there are meaningful ties to the District of Columbia." (internal quotation marks omitted)). That is to say, an official's signature and promulgation of a rule might serve as data points militating against transfer, if the facts and circumstances surrounding these activities otherwise suggest that officials in Washington were significantly involved in the development of the rule. But the League has not unearthed any evidence of such involvement here—because there is none. See Williams Decl. at 3–4.

And this dearth of evidence distinguishes the present case from the precedent the League cites. In Wilderness Society, for example, the court acknowledged that the Secretary of the Interior had signed certain documents in the District of Columbia concerning a challenged agency decision—but it was not this fact alone that connected the controversy to the District. See 104 F. Supp. 2d at 14. Instead, that court found that the Secretary had been heavily involved throughout the agency's decisionmaking process: "He made a six-day visit to the [affected] area," the court noted, "and [he] met with and was briefed by local" Alaskans before the agency made its decision. Id. Moreover, the Secretary "briefed the public on his decision" in the District of Columbia, and

the Department of the Interior held hearings in the District about the proposed decision. Id. The court thus considered a litany of District of Columbia connections before denying the government's motion to transfer; it did not consider any one of these activities (e.g., the Secretary's signature, rule promulgation, or briefings) to be dispositive. Indeed, the only fair reading of Wilderness Society is that all of these factors—taken together—created a "substantial" nexus between the District of Columbia and the challenged agency decision. Id. Without a similar list of material connections in this case, the Court simply cannot conclude that plaintiffs' claims should be heard in the District of Columbia.

The League's final argument is likewise unconvincing. It contends that "[m]ost activities covered by the incidental take regulation at issue here . . . will in fact occur outside of Alaska" in federal waters. Pls.' Opp'n at 12–13. The League therefore discounts Alaska's interest in this case. But this is a far-too-circumspect reading of the local-controversy standard. The question is not whether "only [Alaska] residents have an interest in the resolution of this case." W. Watersheds Proj., 942 F. Supp. 2d at 103. The question, instead, is whether "because [Alaska] residents have a broad interest in the issues [in this case], and because it will impact them directly, the controversy is local in nature." Id. (emphasis omitted). The Court has already answered that question in the affirmative: "[t]he implications of a decision resolving this dispute will be felt most acutely in [Alaska]." Id. (emphasis added). The Alaska Wilderness League offers nothing to contradict that finding. In fact, it (begrudgingly) admits certain facts which illustrate the direct effect this dispute will have on Alaska's sovereign territory—both land and water. See Pls.' Opp'n at 13 n.7 ("[W]alruses foraging around Hanna Shoal are also at risk swimming to and from resting and nursing grounds on the coast, and thus some limited activity within state waters may be implicated by the complaint."). Transfer of this case to the District of Alaska therefore remains

15

the most appropriate course—venue lies there, after all, and that District strikes the right balance among the public and private interests at play in this case.

## IV. MOTION TO INTERVENE

All of this leaves one final issue for the Court to (briefly) consider. The Alaska Oil and Gas Association has moved to intervene as of right in this case pursuant to Rule 24(a) of the Federal Rules of Civil Procedure. The Association "is a private, non-profit trade association whose member companies represent the majority of oil and gas exploration . . . activities in Alaska, including activities within the Chukchi Sea and adjacent coastal areas." Alaska Oil & Gas Assoc. Mot. to Intervene [ECF No. 10] ("Mot. to Intervene") at 1. And the Association—as the reader might recall—is the organization that originally petitioned the Fish and Wildlife Service for the incidental-take regulation that launched this case. As such, the Association believes that it "is entitled to intervention as of right on plaintiffs' claims to defend its direct interests in the 2013–2018 Chukchi" incidental-take regulations. Id. at 5. Neither the plaintiffs in this case nor the government oppose the Association's request. See Mot. to Intervene at 1 n.1 ("Federal Defendants . . . take no position on this motion."); Pls.' Resp. to Mot. to Intervene [ECF No. 16] at 2 ("Plaintiffs do not oppose [the Association's] motion.").

But even beyond this lack of opposition, the Association's intervention petition wins on the merits. First, the Association has Article III standing to intervene in this case, as any modification to the current incidental-take regulations would surely injure the Association's members, who operate in and around the Pacific walrus's homeland, and a court could certainly correct this (alleged) wrong. See Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977) (explaining the test for organizational standing). And second, the Association satisfies all four elements of this Circuit's intervention-as-of-right test: (1) its motion to intervene arrived very

16

early in the lifecycle of this case; (2) the Association "demonstrate[d] the existence of a legally protected interest for purposes of Rule 24(a)," largely because it meets the requirements of constitutional standing, Jones v. Prince George's Cnty., Md., 348 F.3d 1014, 1019 (D.C. Cir. 2003); (3) for similar reasons, disposition of this case in plaintiffs' favor would certainly harm the Association's interests; and (4) the Association's interests in the case are sufficiently different from those of the government so that the government's representation might be inadequate, see Trbovich v. United Mine Workers of Am., 404 U.S. 528, 538 n.10 (1972) (describing the burden associated with this fourth element as "minimal"). See, e.g., Fund for Animals, Inc. v. Norton, 322 F.3d 728, 731 (D.C. Cir. 2003) (describing the four-part test). Intervention, in sum, is the Association's right in this case.

## CONCLUSION

The Court will therefore grant the government's motion to transfer this case to the District of Alaska. Before transferring the case, however, the Court will also grant the Alaska Oil and Gas Association's motion to intervene. A separate Order has issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: April 17, 2015