**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

ALASKA WILDERNESS LEAGUE,
CENTER FOR BIOLOGICAL
DIVERSITY, GREENPEACE, INC.,
NATURAL RESOURCES DEFENSE
COUNCIL, RESISTING
ENVIRONMENTAL DESTRUCTION ON
INDIGENOUS LANDS, and SIERRA
CLUB,

        Plaintiffs,

    v.

SALLY JEWELL, Secretary of the
Interior, and UNITED STATES FISH
AND WILDLIFE SERVICE,

        Defendants,

    and

ALASKA OIL AND GAS ASSOCIATION,

        Intervenor-Defendant.

Case No. 3:15-cv-00067-SLG

## ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT

Before the Court at Docket 47 is Plaintiffs' Motion for Summary Judgment.  The

Federal Defendants and Alaska Oil and Gas Association both opposed and cross-moved

for summary judgment.[1]  Oral argument was not requested by any party and was not

necessary to the Court's determination.  For the reasons set forth below, Plaintiffs' motion

---

[1] Docket 55 (Federal Opp.) and Docket 53 (Intervenor-Defendant's Opp.); *see* D.Ak LR 16.3(c)(2)
(in administrative appeals, a defendant's brief in opposition is deemed a cross-motion for
summary judgment).

will be denied and the Federal Defendants' and Intervenor-Defendant's cross-motions will be granted.

Plaintiffs, six environmental organizations, challenge an incidental take regulation ("ITR") promulgated by the U.S. Fish and Wildlife Service ("the Service") that is effective from June 12, 2013 to June 12, 2018. The ITR sets out the permissible methods for the incidental taking of small numbers of Pacific walruses in the Chukchi Sea in connection with oil and gas exploration activities.[2] The Chukchi Sea is located off the North Slope of Alaska. It is a promising location for oil and gas exploration and development. It is also an important habitat for the Pacific walrus, particularly in the Hanna Shoal region within the sea. Plaintiffs assert that the ITR violates the Marine Mammal Protection Act ("MMPA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA"). Plaintiffs' claims all relate to the manner in which the ITR addresses mitigation measures for walruses in the Hanna Shoal area.

## I.    The Marine Mammal Protection Act

The MMPA generally prohibits the taking of marine mammals.[3] The term "take" is defined broadly under the Act and means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."[4] The MMPA defines harassment to include "any act of pursuit, torment, or annoyance" which "has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral

---

[2] The ITR also permits the incidental taking of small numbers of polar bears, but that portion of the regulation is not at issue in this litigation, and is not addressed in this Order.

[3] 16 U.S.C. § 1371(a).

[4] *Id.* at § 1362(13).

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 2 of 24

patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering."[5]

The MMPA includes several exceptions to the general taking prohibition. The exception at issue in this case allows for "the incidental, but not intentional, taking by citizens while engaging in [an activity such as oil exploration] . . . of small numbers of marine mammals of a species or population stock" when the Secretary of the Interior "finds that the total of such taking . . . will have a negligible impact on such species or stock . . . ."[6] After notice and comment, the Secretary may then prescribe regulations that authorize such take for up to five years. The regulations must "set forth permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance."[7] This type of regulation is known as an incidental take regulation, and is the type of regulation that is challenged here.

After an ITR is issued, a citizen may apply for a letter of authorization ("LOA") that authorizes incidental take consistent with the ITR. LOAs are issued after a non-public process if the Service determines that the proposed activity is one described in the incidental take regulation and concludes that the level of take caused by the activity will

---

[5] *Id.* at § 1362(18)(A)(i–ii).

[6] *Id.* at § 1371(a)(5)(A)(i).

[7] *Id.*

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 3 of 24

be consistent with the findings made in the regulation.[8]  Notice of the issuance of an LOA is to be published in the Federal Register within 30 days of its issuance.[9]  The regulation also provides that LOAs will specify "any additional terms and conditions appropriate for the specific request."[10]

In 1991, the Service first issued regulations authorizing the incidental take of walruses and polar bears in connection with oil and gas exploratory activities in the Chukchi Sea for a period of five years.[11]  Another set of five-year incidental take regulations were issued for the Chukchi Sea for the period from 2008 through 2013.  A legal challenge was brought regarding those regulations that was rejected by the Alaska District Court and affirmed on appeal to the Ninth Circuit.[12]

## II.    The National Environmental Policy Act

Pursuant to NEPA, an agency must prepare an Environmental Impact Statement ("EIS") "in every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment."[13]  NEPA's implementing regulations provide that an agency shall prepare an Environmental Assessment ("EA") to determine whether a proposed federal action will have a significant impact on the human

---

[8] 50 C.F.R. § 18.27(f)(1–2).

[9] *Id.* at § 18.27(f)(3).

[10] *Id.* at § 18.27(f)(4).

[11] 56 Fed. Reg. 27,443 (June 14, 1991).

[12] 73 Fed. Reg. 33,212 (June 11, 2008); *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012); *Ctr. for Biological Diversity v. Salazar*, No. 3:08-cv-00159-RRB, Docket No. 58 (D. Alaska Jan. 8, 2010).

[13] 42 U.S.C § 4332(C).

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 4 of 24

environment such that an EIS is warranted.[14]  An EA is a 'concise public document" that "include[s] brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."[15]  If the agency concludes in the EA that there is no significant environmental impact from the proposed project, the federal agency issues a finding of no significant impact ("FONSI") in lieu of preparing an EIS.[16]  "In reviewing an agency's decision not to prepare an EIS under NEPA, the Court employs an arbitrary and capricious standard that requires it to determine whether the agency has taken a 'hard look' at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant."[17]

### III.    The 2013 Chukchi Sea Regulations

On January 31, 2012, the Alaska Oil and Gas Association ("AOGA") requested that the Service promulgate an incidental take regulation allowing the incidental take of Pacific walruses and polar bears in the Chukchi Sea during oil and gas exploration activities for a period of five years.  The Secretary published a proposed incidental take regulation on

---

[14] 40 C.F.R. § 1508.9.

[15] 40 C.F.R. §§ 1508.9(a), (b).

[16] 40 C.F.R. § 1508.9(a)(1).

[17] *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citations omitted).  While many Ninth Circuit decisions treat the "hard look" requirement as another formulation of the arbitrary and capricious standard, some address it separately as a measure of the overall adequacy of an EA or EIS.  *Compare In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) *with Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992-93 (9th Cir. 2004).

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 5 of 24

January 9, 2013, seeking comment from the public.[18]  The proposed rule included the delineation of a specific area in the Chukchi Sea that it defined as the Hanna Shoal Walrus Use Area.  And it stated that "[b]ased on the significant biological value of Hanna Shoal to walrus foraging, and the likelihood of encountering large groups of foraging walruses in that area through September, we do not anticipate issuing any [letters of authorization] for seismic or drilling activity in the Hanna Shoal region during the 5-year span of these proposed regulations."[19]

On May 14, 2013, the Service issued an EA for the proposed regulation that evaluated whether a full EIS was needed pursuant to NEPA.  The EA concluded that "the effects of the rule are not significant because it only authorizes incidental take of small numbers that will have only negligible impacts on trust species populations and no unmitigable impact on subsistence use of those species."[20]  The Service also issued a Finding of No Significant Impact ("FONSI"), which concluded that the preparation of an EIS was not required by NEPA.[21]

On June 12, 2013, the Service promulgated the final incidental take regulation.[22] The Final Rule allows the industry to apply for letters of authorization to permit the incidental take of Pacific walruses in connection with oil and gas exploration activities in

---

[18] 78 Fed. Reg. 1,942 (Jan. 9, 2013) (Proposed Rule).

[19] 78 Fed. Reg. at 1,975.

[20] Docket 47-3 (EA) at 71.

[21] Docket 47-2 (FONSI).

[22] 78 Fed. Reg. 35,364 (June 12, 2013) (hereinafter "Final Rule" or "ITR") (also located in the Administrative Record at ARITR00053869 and at Docket 47-1).

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 6 of 24

the Chukchi Sea. The ITR contains a number of specified mitigation, monitoring and reporting requirements, including minimum distances that aircraft and vessels must maintain from walruses on land, water and sea ice, on-board marine mammal observers, and reporting requirements.[23] It also specifies that "[n]o more than two simultaneous seismic operations and three offshore exploratory drilling operations will be authorized in the Chukchi Sea region at any time."[24] And the ITR specifies that "[o]perators must maintain a minimum spacing of 24 km (15 mi) between all active seismic source vessels and/or drill rigs during exploration activities to avoid significant synergistic or cumulative effects from multiple oil and gas exploration activities on foraging or migrating walruses."[25]

The Final Rule establishes a Hanna Shoal Walrus Use Area ("HSWUA") and recognizes that "it is critical to minimize disturbance in this area of highly concentrated [walrus] use during July through September."[26] But the Final Rule does not preclude all exploratory activity in the HSWUA. Rather, it finds that from "July through September, additional mitigation measures may be applied to activities within the HSWUA on a case-by-case basis. These mitigation measures include, but may not be limited to, seasonal restrictions, reduced vessel traffic, or rerouting of vessels."[27] The Final Rule also recognizes that the mitigation measures may be necessary in the HSWUA "to minimize

---

[23] *Id.* at 35,422–23, 35,426 (codified at 50 C.F.R. §§ 18.118(a)(2)(i–ii, vi), (3)(i), 18.118(c)).

[24] Final Rule at 35,423.

[25] *Id.*

[26] Final Rule at 35,399.

[27] Final Rule at 35,423.

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 7 of 24

potential disturbance and ensure consistency with the MMPA mandates that only small numbers of walruses be affected with a negligible impact on the stock."[28]  Apart from an aircraft altitude restriction, the Final Rule does not impose specified additional mitigation for the HSWUA distinct from the rest of the Chukchi Sea.[29]  Rather, the ITR explains that

> On a case-by-case basis, as individual LOA applications are received, we will examine the proposed activities in light of the boundaries of the HSWUA, the nature and timing of the proposed activities, and other available information at the time. If the Service determines that the proposed activity is likely to negatively impact more than small numbers of walruses, we will consider whether additional mitigation and monitoring measures could reduce any potential impacts to meet the small numbers and negligible impact standards. The Service will make those determinations on a case-by-case basis.[30]

As noted above, the 2013 ITR was preceded by a 2008 ITR regulation for the Chukchi Sea.  Overall, the 2013 ITR contains more stringent mitigation measures than its predecessor.  The principal changes in the mitigation measures are set out in bold in the following chart:

//

//

//

//

//

---

[28] Final Rule at 35,371.

[29] *See* Final Rule at 35,424 (codified as 50 C.F.R. § 18.118(a)(4)(v)).

[30] *Id.*

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 8 of 24

Comparison of Mitigation Measures for Walruses in 2008 and 2013
Chukchi Incidental Take Regulations

| Mitigation Type | 2008 Regulation[31] | 2013 Regulation[32] |
|---|---|---|
| Vessel Approach Limitations | ½ mile on land or ice | ½ mile on ice, **1 mile groups on land** |
| Vessel Operation Restrictions | Yes, near feeding walrus groups (reduced speeds, minimum distance, no separating of walruses) | Yes, near **groups of 12 or more walruses** (reduced speeds, minimum distance, no separating of walruses) |
| Aircraft Restrictions | Aircraft minimum of 1,000 ft. flying altitude within ½ mile of walruses on land or ice, no hovering or circling near walruses | **Helicopter minimum of 3,000 ft. flying altitude within 1 mile of walrus groups on land**, no hovering or circling near walruses |
| Limited Offshore Exploration Period | July 1-November 30 | July 1-November 30 |
| Minimum Spacing | 15 miles between active seismic-source vessels or drilling rigs, no more than four simultaneous seismic operations, no limit specified on simultaneous offshore drilling operations | 15 miles between active seismic-source vessels or drilling rigs, no more than **two** simultaneous seismic operations and **three** simultaneous offshore drilling operations |
| Wildlife Population Estimate Surveys | Yes | Yes |
| Hanna Shoal Additional Mitigation | None | **Additional measures applied on a case-by-case basis, including but not limited to seasonal restrictions, reduced vessel traffic, or rerouting of vessels. Aircraft to avoid operating below 1,500 feet between July 1 and September 30** |

---

[31] 73 Fed. Reg. 33,212 (June 11, 2008) (50 C.F.R. § 18.118(a)(1–3) (2008)).

[32] 50 C.F.R. § 18.118(a)(2–6).

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 9 of 24

**DISCUSSION**

## I.    Jurisdiction

The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because the case arises under the laws of the United States.  An aggrieved party may seek review of this agency action in the federal district court pursuant to the Administrative Procedure Act.[33]

Plaintiffs assert that they have associational standing in this case because their members have standing in their own right, the interests at stake are germane to Plaintiffs' organizational purposes, and this suit does not require the participation of individual members of the Plaintiff organizations.[34]  Defendants do not challenge Plaintiffs' standing. After reviewing the declarations submitted by Plaintiffs, the Court concludes that one or more of the Plaintiffs have the requisite associational standing to maintain this suit.[35]

## II.    Standards of Review

A court reviews an agency's compliance with the MMPA and NEPA under the Administrative Procedure Act.[36]  "The reviewing court may not set aside an agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[37]  A court's review of whether an agency action is arbitrary and

---

[33] 5 U.S.C. § 702.

[34] Docket 47 (Motion) at 25–26 (citing *Friends of the Earth v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 181 (2000)).

[35] *See* Docket 47-25 to 47-33 (Declarations).

[36] *Humane Soc'y v. Locke*, 626 F.3d 1040, 1047 (9th Cir. 2010).

[37] 5 U.S.C. § 706(2)(A).

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 10 of 24

capricious should be "searching and careful," but "narrow," as a court may not substitute its judgment for that of the administrative agency.[38] "[A court] will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, 'entirely failed to consider an important aspect of the problem,' or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"[39]

In reviewing an agency's interpretation and application of statutes for which it is responsible, this Court follows the deferential two-step inquiry set out in *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*[40] First, the Court asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[41] Second, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."[42]

---

[38] *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989).

[39] *Ecology Ctr. v. Castaneda,* 574 F.3d 652,656 (9th Cir. 2009).

[40] 467 U.S. 837, 843–44 (1984). Prior to undertaking the two-step *Chevron* inquiry, the Court must determine whether Congress intended "the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law." *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). This step is colloquially referred to as "Step Zero" of the *Chevron* analysis. *See, e.g.*, *Oregon Rest. & Lodging v. Solis*, 948 F. Supp. 2d 1217, 1222-23 (D. Or. 2013). *See also Alaska Wilderness League v. Jewell*, --- F.3d ---, 2015 WL 3620115 at *3-4 (9th Cir. June 11, 2015).

[41] *Chevron*, 467 U.S. at 842–43.

[42] *Id.* at 843. The Supreme Court and the Ninth Circuit sometimes describe the statutory standard as "whether the agency's interpretation is reasonable." *See King v. Burwell*, No. 14-114, -- S. Ct. --, 2015 WL 2473448, *8 (2015); *Alaska Wilderness League*, 2015 WL 3620115 at *7.

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 11 of 24

### III. The Incidental Take Regulation's Compliance with the MMPA

Plaintiffs assert that the ITR violates the MMPA in two ways: (1) it fails to set forth the means of effecting the least practicable adverse impact on walruses, and (2) it fails to make a negligible impact finding based on "total" take.

### a. The least practicable adverse impact finding.

The MMPA permits the Service to allow for the incidental take of the Pacific walrus only if the Secretary, among other steps, "prescribes regulations setting forth permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat."[43]

Plaintiffs cite to portions of the ITR that indicate that additional mitigation measures beyond those set out in the regulation might be required in the HSWUA to minimize potential disturbance to walruses but observe that the Service intends to adopt these additional measures through the LOA process.[44] Plaintiffs maintain that the "MMPA forbids this approach: it requires the Secretary to 'set forth' at the outset—in the regulation and subject to public comment—the means of effecting the least practicable adverse impact to marine mammal stock and habitat."[45] Plaintiffs vigorously protest the Service's approach to "relegate to private negotiation with industry operators the determination of essential protections that the MMPA requires be forged through notice-and-comment

---

[43] 16 U.S.C. § 1371(a)(5)(A)(i)(II).

[44] Docket 47 (Motion) at 30.

[45] *Id.*

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 12 of 24

rulemaking (and NEPA requires be vetted for their environmental consequences)" and not deferred to a later, non-public LOA stage.[46]

The Service responds that because neither the MMPA nor its enabling regulations define what "other means of effecting the least practicable adverse impact" means, "it is left to [the Service] to apply its unique expertise to the facts and circumstances presented to give meaning to these terms on a case-by-case basis."[47] The Service asserts that the mitigation requirements in the Final Rule "fall into two categories: mitigation measures applicable to all LOAs and additional mitigation measures that can be imposed on a case-by-case basis to a particular LOA."[48] The Service maintains that "[r]equiring U.S. citizens to apply for and obtain an LOA with additional customized mitigation, monitoring, and reporting requirements also is one 'other means of effecting the least practicable adverse impact.'"[49] It maintains that this "flexible approach accounts for the inherent and unavoidable limits of the available information on when and where any particular activity may occur in relation to where exactly walruses will be in a given year."[50]

The Intervenor-Defendant asserts that the "adaptive mitigation" approach created in the ITR allows for more protective mitigation measures than the 2008 ITR, which was upheld by the courts.[51] The parties all agree that "additional mitigation measures . . . may

---

[46] Docket 56 (Reply) at 12.

[47] Docket 55 (Federal Opp.) at 26; *see also* Docket 53 (Intervenor-Defendant's Opp.) at 26-32.

[48] Docket 55 (Federal Opp.) at 27.

[49] *Id.* (citing 50 C.F.R. 18.27(b), (f)(4)).

[50] Docket 55 (Federal Opp.) at 27.

[51] Docket 53 (Intervenor-Defendant's Opp.) at 24.

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 13 of 24

be necessary for HSWUA to . . . ensure consistency with the MMPA mandates that . . . walruses be affected with a negligible impact on the stock."[52]

Both the Service and the Intervenor-Defendant cite to decisions of numerous federal trial and appellate courts that they assert have approved similar adaptive management measures.[53] And Defendants assert that Plaintiffs' citations to the sonar cases from the Northern District of California are inapplicable, because unlike in those cases, the Service here "included a mitigation provision specific to the [Hanna Shoal] in its regulations."[54]

Although presented in different ways, the core of this dispute is whether the MMPA permits the Service to apply an adaptive management approach through the LOA process instead of specifying each mitigation measure in the incidental take regulation that will be applied in the Chukchi Sea and particularly in the Hanna Shoal. In promulgating an incidental take regulation, the MMPA requires the Service to set forth "permissible methods of taking" and "other means of effecting the least practicable adverse impact on such species or stock and its habitat."[55] The parties disagree on whether the statutory directive to set forth "other means" requires a comprehensive list of mitigation measures in the incidental take regulation itself. When an agency interprets a statute, a court

---

[52] Docket 56 (Reply) at 14 (quoting Final Rule at 35,371).

[53] Docket 55 (Federal Opp.) at 28; Docket 53 (Intervenor-Defendant's Opp.) at 30 n.79. *See also* J. B. Ruhl & Robert L. Fischman, Adaptive Management in the Courts, 95 Minn. L. Rev. 424 (2010).

[54] Docket 55 (Federal Opp.) at 31; *see also* Docket 53 (Intervenor-Defendant's Opp.) at 30 n. 81.

[55] 16 U.S.C. § 1371(a)(5)(A)(i)(II).

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 14 of 24

applies the *Chevron* analysis to determine whether to defer to the agency's interpretation. Here, the Court finds that Congress intended the Service to speak with the force of law in regulations implementing the MMPA, and that § 1371(a)(5)(A)(i)(II) is ambiguous as to whether all mitigation measures must be included in an incidental take regulation. Therefore, the Court must determine whether the Service's interpretation of the statutory text is a permissible one.[56]

Of the arguments raised by Plaintiffs, the Court took particular note of the assertion that allowing the Service to conduct mitigation decision-making through the LOA process violates the MMPA because the MMPA envisions a public decision-making process. The Court recognizes that the LOA process may move some important environmental decision-making from a public notice-and comment regime into a less public case-by-case process.[57] But the Court finds that the statute does not unambiguously require the Service to enact every mitigation measure in the incidental take regulation itself. Further, the Court finds that it is not an impermissible construction of the statute for the Service to conclude that the LOA process may be used to impose additional mitigation measures that are not subject to notice and comment, particularly when such agency decisions would presumably themselves be subject to judicial review.[58] The Court therefore holds that the Service's interpretation of the MMPA to allow it to impose specific additional

---

[56] *Chevron*, 467 U.S. at 843.

[57] *See, e.g.*, 16 U.S.C. § 1374.

[58] *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). *See also Ctr. for Bio. Diversity v. Kempthorne*, 588 F.3d 701, 712 (9th Cir. 2009) (upholding 2008–2013 Chukchi ITR and recognizing that "LOAs include mitigating guidelines . . . .").

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 15 of 24

mitigation measures through LOAs as "other means of effecting the least practicable adverse impact" is a permissible construction of the statute.[59]

### b. The total take determination.

The MMPA authorizes the Service to allow for the incidental taking of protected mammals if, after notice and comment, it finds "that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock."[60] Plaintiffs assert that the ITR's "failure to identify all of the mitigation measures necessary to limit impacts from activities in the Hanna Shoal area violated the MMPA's requirement that the Service assess the '*total* of such taking during each five-year (or less) period concerned' and assure it will have no more than 'a negligible impact' on walrus stocks or the species."[61] Plaintiffs assert that because the amount of any additional mitigation that would be required to ensure that only negligible impact would occur in connection with walrus use in the HSWUA was unknown when the ITR was promulgated, the Service did not "make a valid finding for the 'total of such taking during' the five-year life of the regulation throughout the 'specified geographical region.'"[62]

---

[59] The Court has reviewed the Northern District of California cases cited by the Plaintiffs and finds them inapposite. In those cases, the Court found that the National Marine Fisheries Service erred under the MMPA when it recognized in its regulation that sensitive habitat required exclusion from sonar use, but left the determination of additional exclusion zones to a later post-rulemaking process. Here, the Service has delineated the HSWUA area in the ITR and retained the authority to impose additional mitigation within that area as an "other means of effecting the least practicable adverse impact" on the Pacific walrus.

[60] 16 U.S.C. § 1371(5)(A)(i)(1).

[61] Docket 47 (Motion) at 31 (quoting 16 U.S.C. § 1371(a)(5)(A)(i)(I) (emphasis in original)).

[62] Docket 47 (Motion) at 31–32 (internal citations and quotation marks omitted).

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 16 of 24

Plaintiffs argue that the "piecemeal letter of authorization process cannot provide such a cumulative assessment for the full five-year period."[63]

The Federal Defendants respond that the ITR's factual finding of negligible impact was made based "on the best scientific evidence available and a consideration of numerous factors and specific Congressional direction."[64] They assert that "[b]y retaining the ability to add mitigation measures, [the Service] can quickly adapt its approach to account for future unknowns and ensure that the level of activity and potential take is consistent with its findings."[65] Accordingly, the Service argues that its ability to add additional mitigation via an LOA "supports rather than undermines [the Service's] negligible impact finding."[66] Likewise, AOGA maintains that the Service "is not required to quantify the number of animals to be taken" when making its negligible impact determination.[67] Plaintiffs reply that the Defendants' position "hinges on the premise that the MMPA allows the Secretary to promulgate a take regulation without knowing that the total take will be negligible, as long as she makes it true later. But it does not. Rather, the statute requires an up-front finding . . . that total, cumulative take over the course of the five-year regulation will be negligible."[68]

---

[63] Docket 47 (Motion) at 32.

[64] Docket 55 (Federal Opp.) at 33.

[65] Docket 55 (Federal Opp.) at 34 (internal quotation marks omitted).

[66] Docket 55 (Federal Opp.) at 34.

[67] Docket 53 (Intervenor-Defendant's Opp.) at 34–35.

[68] Docket 56 (Reply) at 12–13.

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 17 of 24

In effect, Plaintiffs are asserting that the total take must be quantified in the ITR. But the Ninth Circuit has considered this argument and held that there is nothing "in Section 101(a)(5)(A) that requires the Service, when promulgating incidental take regulations, to quantify or estimate the number of mammals that would be taken. In contrast, Congress expressly required numerical estimates in other provisions of the MMPA."[69]

## IV.   The Challenge to the Service's Factual Findings

Plaintiffs next challenge two of the central factual findings in the ITR as arbitrary and capricious under the APA, asserting that these findings lack support in the record."[70]

First, Plaintiffs argue that the Service lacked the necessary factual basis for finding that "the total expected takings of Pacific walruses . . . during Industry exploration activities will impact small numbers" of walruses.[71]  Plaintiffs cite to a portion of the Final Rule that found that large numbers of walruses could be encountered in the Hanna Shoal area from July through September and that therefore "additional mitigation measures" such as seasonal restrictions may be necessary for activities within the HSWUA.[72] Plaintiffs assert that because the Service failed to specify in the Final Rule the precise mitigation measures necessary for the Hanna Shoal, its "unequivocal finding that 'no more

---

[69] *Ctr. for Bio. Diversity*, 695 F.3d at 906.  *See also Ctr. for Bio. Diversity v. Kempthorne*, 588 F.3d 701, 710 (9th Cir. 2009) ("A negligible impact finding is arbitrary and capricious under the MMPA only if the agency, inter alia, . . . entirely failed to consider an important aspect of the problem . . . ." (internal citations and quotation marks omitted)).

[70] Docket 47 (Motion) at 33.

[71] Docket 47 (Motion) at 34 (quoting Final Rule at 35,364).

[72] Final Rule at 35,371.

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 18 of 24

than small numbers will be taken' [is] devoid of the needed factual support in the record."[73] The Service responds that it "did not need to know whether additional mitigation will be required or what that additional mitigation might be in order to make a valid small numbers finding."[74] Rather, the Service asserts that through the LOA process, it can assure that actual industry activities in the HSWUA conform to its small numbers determination.[75] But Plaintiffs reply that "to avoid being rendered arbitrary and capricious, agency factual findings must be reasoned determinations on the record, not aspirational statements about future proceedings."[76]

In the ITR, the Service interpreted the term "small numbers" to focus on the proportion of walruses that would be impacted by the industry activity "both within the specified geographical region and at the broader population scale."[77] The Ninth Circuit has expressly upheld this interpretation of the term "small numbers" which "focuses primarily on the location of the exploration activities in relation to the mammals' larger population."[78]

Here, the Service determined, based on scientific surveys in the record, that the walruses in the Chukchi Sea represent only a portion of the overall Pacific walrus

---

[73] Docket 47 (Motion) at 35 (citing Final Rule at 35,406).

[74] Docket 55 (Federal Opp.) at 38.

[75] *Id.*

[76] Docket 56 (Reply) at 16 (citing *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521 (9th Cir. 2010)).

[77] Final Rule at 35,400.

[78] *Center for Biological Diversity v. Salazar*, 695 F.3d 893, 907 (9th Cir. 2012).

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 19 of 24

population.  The Service further concluded that the current "active lease area" in which industry activity might occur represents two percent of the Chukchi Sea, and that in any given year industry activity will only occur in a portion of that active lease area.[79]  And the Service found that during the open water season in which authorized exploration could occur, "most walruses in the [eastern Chukchi Sea] migrate out of the region beyond the scope of Industry activities . . . or relocate to coastal haulouts where they can rest on land between foraging excursions."[80]  The Service also noted that because of regulatory coastal buffer zones and lease area exclusions, the Service does "not expect that any takes will occur at coastal haulouts from Industry activities."[81]

As for offshore walrus activities, the Service stated that it "expect[s] that the density of walruses in offshore, open water environments, where most exploration activities are expected to occur, will be relatively low" based on historical walrus movements and distribution patterns.[82]  The Service acknowledges that some coastal walruses make "long foraging excursions from coastal haulouts" to the Hanna Shoal and that it expects "the density of walruses in the [Hanna Shoal] *could be relatively high* compared with other offshore regions, even during periods of minimal sea ice cover."[83]  But the Service adds:

> The timing and movement routes [of the walruses] are not known, and are likely to vary from year to year. . . . [M]onitoring requirements and adaptive mitigation measures are expected

---

[79] Final Rule at 35,397.

[80] *Id.* at 35,398.

[81] *Id.*

[82] *Id.*

[83] *Id.* (emphasis added).

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 20 of 24

to limit interactions with groups of walruses encountered in
open water habitats.[84]

The Service concludes that "in consideration of the habitat characteristics where most

exploration activities are expected to occur (open-water environments) and specific

mitigation measures designed to reduce potential interactions with walruses and other

marine mammals, we expect that interactions will be limited to relatively small numbers

of animals compared to the number of walruses in the specified geographic region as well

as the overall population."[85]

The Court finds that the Service presented a reasoned analysis for its small

numbers determination based on the record before it.  It has demonstrated the requisite

"rational connection between the facts found and the choice made."[86]   Plaintiffs'

argument, that the Service *per se* lacks the factual support necessary to make a small

numbers determination when it did not specify each mitigation measure that it might

require for any industry activity in the Hanna Shoal, is unpersuasive where the Service

has put in place extensive science-based general mitigation measures and seeks to

increase the efficacy of those measures with additional, adaptive measures for Hanna

Shoal on an as-needed basis.   Accordingly, the Court finds that the Service's "small

numbers" determination was not arbitrary and capricious.

---

[84] *Id.* at 35,399.

[85] *Id.*

[86] *El Comite Para el Bienestar de Earlimart v. U.S. EPA*, 786 F.3d 688, 698 (9th Cir. 2015) (quoting
*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *see*
Docket 55 (Federal Opp.) at 33.

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 21 of 24

Plaintiffs assert that the Service similarly lacked a basis in the record for its determination that "[t]he total expected takings of Pacific walruses . . . will have a negligible impact on th[at] species."[87] "[T]he negligible impact analysis considers the likely effects of interactions on the mammals' recruitment and survival."[88] Here again, Plaintiffs focus on the ITR's failure to specify the additional mitigation measures that may be required within the Hanna Shoal.[89] But similar to its small numbers determination, the Service carefully set forth the bases of its negligible impact determination in the Final Rule.[90] And again, based on the overall record, the Service's adaptive management approach to the Hanna Shoal does not render its "negligible impact" finding arbitrary and capricious.

## V.    The Service's Finding of No Significant Impact

Plaintiffs argue that the FONSI finding under NEPA is "unconvincing because the agency expressly predicated it on the Secretary's supposed small numbers and negligible impact findings that the record shows were unwarranted."[91] Plaintiffs maintain that "the Service's failure to prepare an EIS for the incidental take regulation is lawful only if the agency provided a convincing explanation of how the mitigation measures described in

---

[87] Docket 47 (Motion) at 35 (quoting Final Rule at 35,364).

[88] *Center for Biological Diversity v. Salazar*, 695 F.3d 893, 908 (9th Cir. 2012); *see id.* (finding small numbers determination that relied in part on additional mitigation imposed through LOAs was not arbitrary and capricious).

[89] Docket 47 (Motion) at 36.

[90] *See* Final Rule at 35,403–05.

[91] Docket 47 (Motion) at 36.

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 22 of 24

its EA are sufficient to reduce the impact on walruses foraging in and around the Hanna Shoal region to a level that will ensure there is no potential for significant effects."[92]

The Service responds that the Council on Environmental Quality ("CEQ"), the entity responsible for coordinating federal environmental policy and NEPA, has specifically approved of "mitigated FONSIs." The Service cites to CEQ's guidance that "when such mitigation measures are available and an agency commits to perform or ensure the performance of them, then these mitigation commitments can be used to support a FONSI, allowing the agency to conclude the NEPA process and proceed with its action without preparing an EIS."[93]

The Court has concluded, for the reasons discussed above, that the Service's small numbers and negligible impact findings were not arbitrary and capricious. According, the Service could properly rely on those findings in its EA to conclude that "the effects of the [incidental take regulation] are not significant because it only authorizes incidental take of small numbers that will have only negligible impacts on trust species populations."[94] The Court also finds that the Service met its obligation to describe the mitigation necessary to meet its finding of no significant impact, because the EA describes both the general mitigation measures that would be applied throughout the Chukchi Sea

---

[92] Docket 47 (Motion) at 37.

[93] Docket 55 (Federal Opp.) at 40 (quoting Final Guidance for Federal Departments and Agencies on the Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact, 76 Fed. Reg. 3843-01, 3848 (Jan. 21, 2011)).

[94] Docket 47-3 (EA) at 71.

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 23 of 24

as well as the additional mitigation measures that might be applied to the Hanna Shoal.[95]

The Service adequately developed and analyzed its proposed mitigation measures in the EA "to a reasonable degree" as required by law.[96]  And the discretionary nature of the additional mitigation measures does not render the EA arbitrary, capricious, or in violation of NEPA.[97]  Accordingly, the Court finds that the Service's issuance of a FONSI was not in violation of NEPA or the APA.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment at Docket 47 is DENIED and Defendants' Cross-Motions for Summary Judgment at Docket 53 and 55 are GRANTED.[98]

DATED this 2nd day of July, 2015.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

---

[95] ARITR00050405–424.

[96] *Tillamook Cnty. v. U.S. Army Corps. of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002) (quoting *Wetlands Action Network v. U.S. Army Corps of Eng'rs,* 222 F.3d 1105, 1121 (9th Cir.2000) (*abrogated on other grounds by Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011))).

[97] *See Pac. Coast Fed'n of Fishermen's Assocs. v. Blank*, 693 F.3d 1084, 1103–04 (9th Cir. 2012) ("The plaintiffs also argue that there is no assurance that adaptive management reserve shares will be allocated to fishing communities. However, an 'assurance' that a particular number of privileges will go to a particular purpose at a particular time is not only inconsistent with the notion of "adaptive management," it is not required by NEPA: 'a mitigation plan need not be legally enforceable, funded or even in final form to comply with NEPA's procedural requirements.'") (quoting *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 681 n.4 (2000)).

[98] The Motions for Judicial Notice at Dockets 54 and 57 are GRANTED and no further briefing shall be submitted on the motions.

3:15-cv-00067-SLG, *Alaska Wilderness League et al. v. Jewell, et al.*
Order re Cross-Motions for Summary Judgment
Page 24 of 24