Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
441 W. 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102 / F: 907.277.1390
E: egrafe@earthjustice.org

Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751 / F: 907.463.5891
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Alaska Wilderness League, et al.*

Nathaniel S.W. Lawrence (Wash. Bar No. 30847) (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

Jared E. Knicley (Va. Bar No. 84060) (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th Street NW, Suite 300
Washington, DC 20005
T: 202.513.6242 / F: 202.289.1060
E: jknicley@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| ALASKA WILDERNESS LEAGUE, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>SALLY JEWELL, *et al.*,<br><br>*Defendants*,<br><br>and<br><br>ALASKA OIL AND GAS ASSOCIATION,<br><br>*Intervenor-Defendant.* | Case No. 3:15-cv-00067-SLG<br><br>**PLAINTIFFS' RULE 62(c) MOTION FOR INJUNCTION PENDING APPEAL** |

Plaintiffs Alaska Wilderness League, Center for Biological Diversity, Greenpeace, Inc., Natural Resources Defense Council, Resisting Environmental Destruction on Indigenous Lands, and Sierra Club have filed a Notice of Appeal, Doc. 60, from this Court's July 2, 2015 order, Doc. 59. Pursuant to Rule 62(c) of the Federal Rules of Civil Procedure, Plaintiffs move for an injunction pending appeal. Intervenor Defendant's member Shell Gulf of Mexico Inc. (Shell) may begin large-scale oil exploration operations in the Chukchi Sea as soon as mid-July. An injunction pending appeal is necessary to maintain the *status quo* and to preserve the possibility for Plaintiffs to obtain effective and complete relief. Plaintiffs request that the Court issue an injunction staying the effectiveness of the challenged incidental take regulation (ITR) and the Letter of Authorization (LOA) issued to Shell pursuant to the ITR pending resolution of Plaintiffs' appeal. In a Motion to Expedite filed today, Plaintiffs respectfully request a decision on this motion no later than Thursday, July 16, 2015.

In the alternative, if the Court declines to issue an injunction pending final decision on the appeal, Plaintiffs request the Court issue an order staying the effectiveness of the ITR and LOA issued to Shell until the Ninth Circuit Court of Appeals has the opportunity to decide whether to issue an injunction pending appeal. A temporary injunction until July 31, 2015, would allow time for Plaintiffs to seek an injunction from the Court of Appeals under Fed. R. App. P. 8(a), minimize harm to Plaintiffs while they seek that relief, and minimize any delay for Defendants.[1]

[1] Counsel for the Plaintiffs conferred via email with counsel for Federal and Intervenor Defendants regarding this motion on July 8, 2015. Defendants represent that they oppose Plaintiffs' motion.

## ARGUMENT

The standard for issuance of an injunction pending appeal is the same as the standard for issuance of a preliminary injunction. *See Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006), *abrogated on other grounds by Winter v. Natural Res. Def. Council*, 555. U.S. 7 (2008). Generally, a party seeking an injunction must demonstrate the existence of four factors: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm absent the issuance of an injunction, (3) that the balance of equities tips in its favor, and (4) that issuance of an injunction is in the public interest. *Winter*, 555. U.S. at 20. An injunction may be warranted without a demonstrated likelihood of success on the merits where the moving party raises "serious questions going to the merits" and demonstrates "a likelihood of irreparable injury and that the injunction is in the public interest" and that the "balance of hardships tips sharply" in its favor. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (concluding the "serious questions" test survived *Winter* ); *see also Conservation Cong. v. U.S. Forest Serv*., 803 F. Supp. 2d 1126, 1129 (E.D. Cal. 2011) (explaining the "sliding scale" approach "applies to requests for Rule 62(c) injunctions pending appeal").

Even when a district court rules against a party on the merits, the same court may enter an injunction pending appeal to preserve the status quo if the party raises serious legal questions and will suffer irreparable harm without injunctive relief while the matter is pending on appeal. In *Schrader v. Idaho Department of Health & Welfare*, for example, the district court ruled against the plaintiff on the merits, but stayed the dissolution of its preliminary injunction pending appeal. 590 F. Supp. 554, 560 (D. Idaho 1984). The Ninth Circuit reversed on the merits, in favor of the plaintiff. 768 F.2d 1107 (9th Cir. 1985). Without the injunction pending appeal, the plaintiff

would have been deprived of the relief to which she was entitled. *See also Wyo. Farm Bureau Fed'n v. Babbitt*, 987 F. Supp. 1349, 1376 (D. Wyo. 1997) (ruling for plaintiffs on the merits but entering a stay of removal of reintroduced wolves pending appeal "[g]iven the importance of the issues presented and the ramifications" of its order), *rev'd*,199 F.3d 1224 (10th Cir. 2000) (reversing district court and upholding wolf reintroduction). Even where the court denies an injunction pending appeal, it may nonetheless enter a shorter-term injunction to allow Plaintiffs to seek emergency injunctive relief from the appellate court. Indeed, this Court recently has entered such an order in circumstances like here where imminent environmental harm was likely absent an injunction. *See In re. Big Thorne Project and 2008 Tongass Forest Plan*, Case No. 1:14-cv-13 RRB, Doc. 110 (D. Alaska, March 31, 2015) (denying injunction pending appeal but granting 14-day stay to allow plaintiffs to seek an injunction pending appeal from the appellate court). *See also Conservation Cong.*, 803 F. Supp. 2d at 1134 (denying an injunction pending appeal, but "because of the potential for irreparable harm," granting plaintiff a limited injunction of 10 days to seek a stay from the Ninth Circuit); *W. Land Exch. Project v. Dombeck*, 47 F. Supp. 2d 1216 (D. Or. 1999) (denying injunction pending appeal, but ordering 60-day delay in land exchange to permit groups to request an injunction pending appeal in the appellate court).

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Although the Court has denied their motion for summary judgment, Plaintiffs have a likelihood of success on appeal and have raised serious questions going to the merits. Plaintiffs rely here on their summary judgment briefing, Doc. 47 & 56, to demonstrate that likelihood and will not reargue the merits. Plaintiffs add only that the Court appears to have misconstrued their argument that the Secretary violated the Marine Mammal Protection Act's (MMPA) requirement to make a negligible impact finding based on total take under the regulation. Doc. 47 at 31-33.

The Court rejected the claim on the basis that Plaintiffs sought to require the Secretary to make a numerical finding of total take. *See* Doc. 59 at 18. However, Plaintiffs' argument is not that the Secretary failed to quantify take. It is that she promulgated the ITR without knowing that total take—however assessed—would be negligible, because she deferred identification of needed mitigation measures and an assessment of whether they would ensure impacts were negligible until the later letter of authorization process. This decision to defer a negligible impact determination as to the Hanna Shoal area and travel corridor, not a failure to quantify take, violates the MMPA. Doc. 47 at 31-33; Doc. 56 at 13-14.

## II. ABSENT AN INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM

Plaintiffs will suffer irreparable injury absent an injunction pending appeal. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). To the best of Plaintiffs' knowledge, Intervenor-Defendant member Shell plans to begin drilling exploratory oil wells into Burger Prospect later this month; plans that, if allowed to proceed, likely would cause irrevocable harm to the already weakened Pacific walrus population and to Plaintiffs' interests. In brief, the major industrial footprint and loud noises of the large-scale drilling operations will displace the walrus population from feeding at important habitat in the area in which Shell proposes to drill, and such displacement will likely

result in reduced survival and reproductive success, especially for the most vulnerable females with young, leading to population-level impacts which are likely to be durable.[2]

As described in Plaintiffs' summary judgment briefs, climate-change-induced receding sea-ice cover has opened up the Arctic's Chukchi Sea summer waters to oil exploration, and it also has caused Pacific walruses to become stressed in novel ways that heighten their vulnerability to industrial disturbance. Doc. 47 at 11-13. Walruses use sea ice as a platform for all major life functions. Doc. 47 at 9-10. The disappearance of summer sea ice has caused "a new pattern of walrus distribution and movement," forcing walruses to rest on shore, far from their prime foraging habitat, and to commute substantial distances to reach their foraging habitat. Doc. 47 at 11-13. Scientists have observed that these climate-change-driven reductions in sea ice, and the walruses' reactions to them, have increased walruses' vulnerability to predation and disturbance, resulting in increased mortality rates among the young and possibly resulting in the premature separation of cows and dependent calves, reductions in available prey bases, declines in individual walrus health and conditions, increased interactions with development activities, and overall population decline. Doc. 47 at 12.

The most significant summer concentration of walruses in U.S. waters occurs in and around an offshore area of the Chukchi Sea called the Hanna Shoal, which has "long been recognized as a critical foraging area for the Pacific walrus in summer and fall" (June to

---

[2] Plaintiffs' members use and enjoy the Chukchi Sea and surrounding area for recreational, scientific, spiritual, subsistence, artistic, and other purposes. *See, e.g.*, Doc. 47-29 at 7-8, ¶¶ 18-24; Doc. 47-30 at 6-7, ¶ 15; Doc. 47-32 at 4-5, ¶¶ 10-11. They go there to experience, study, and photograph wildlife, including walruses, and to enjoy the landscape and solitude. *See, e.g.*, Doc. 47-29 at 7-8, ¶¶ 18-24; Doc. 47-31 at 4, ¶ 14; Doc. 47-32 at 4-6, 8, ¶¶ 10-12, 18. Many of these uses depend on a healthy natural environment, undisturbed by industrial activity. *See, e.g.*, Doc. 47-29 at 10-11, ¶¶ 29-30; Doc. 47-30 at 12, ¶ 32; Doc. 47-32 at 6, ¶ 15. Thus, activities that harm wildlife or disturb this area would cause irreparable injury to Plaintiffs.

October), with the numbers of foraging walruses sometimes totaling in the tens of thousands. Doc. 47 at 10. Walruses, including mothers and calves, travel to the shallow waters around Hanna Shoal to feed on clams and other ocean-bottom organisms. *See* Doc. 47 at 10.

The Service has authorized Shell to operate in the Hanna Shoal region at an area called the Burger Prospect. Ex. 1 (LOA).[3] Shell's planned drilling is a large industrial undertaking. It includes two large drilling vessels. Ex. 4 at 20-21 (Shell Exploration Plan). Ice-breakers, anchor handling vessels, tugs, barges, other support vessels, helicopters, and other aircraft would accompany the drilling vessels and operate over a large area. *Id.* at 21-32; 80 Fed. Reg. 11,726, 11,727-29 (Mar. 4, 2015); 80 Fed. Reg. 35,744, 35,745 (June 22, 2015). Shell's activities would introduce harmful noise and industrial disturbance into the environment between July and October 2015—the same timeframe during which Pacific walruses, including mothers and young, use the area in large numbers. *See* 80 Fed. Reg. at 11,731-51; 80 Fed. Reg. at 35,757; Ex. 4 at 18; Ex. 3 at 12. As the Department of the Interior's Bureau of Ocean Energy Management has acknowledged, industrial noise and disturbance from drilling, vessel traffic, ice-breaking, helicopters, and seismic surveying can cause walruses to abandon preferred feeding areas, separate mothers from calves, and result in increased stress and energy expenditures. *See* Ex. 5 at 7; Ex. 3 at 18, 20.

---

[3] The LOA issued by the Service to Shell on June 30, 2015, precludes activity that could cause walrus take in July, August, and September only in small, variable portions of the Hanna Shoal area—the excluded areas are those estimated to contain 50 percent of the walruses based on prior survey data for each month. Ex. 1 at 7, ¶ 9. This authorization, therefore, permits potential activity over most of the Hanna Shoal region, including in the Burger Prospect and in the travel corridors from shore to these feeding areas, exposing a large portion of the population to significant displacement impacts. Ex. 2 at 8, 14-16, ¶¶ 11,18. *See also* Ex. 3 at 16, 18, 19; Ex. 1.

As Dr. Timothy Ragen, former executive director of the Marine Mammal Commission,[4] describes in a declaration submitted with this motion, the Burger Prospect and Hanna Shoal are part of the same contiguous area that provides important foraging habitat for walruses. Ex. 2 at 7-8, ¶ 10. A substantial number of walruses are likely to be feeding at the Burger Prospect during Shell's operations. *Id.* at 7-8, ¶¶ 10-11. *See also* Ex. 3 at 11 ("Occurrences of walruses in the area of Shell's Burger Prospect are regular and common . . . ."); *id*. at 12 (noting more than ten thousand walruses observed in the Burger Prospect during Shell's 2012 drilling activities). Shell's drilling operations likely will displace thousands of walruses from their key foraging areas at and near the planned operations. Ex. 2 at 12-14, ¶¶ 16-17. Data collected by Shell during its limited 2012 drilling season confirm that Shell's planned drilling and associated activities will displace and harm walruses. Those data—which underrepresent the number of walruses present at the Burger Prospect and harassed by Shell's operations—show that the company's 2012 operations displaced thousands of walruses. *Id.* at 12-14, ¶ 16-17. Shell's operations this year could be twice as large as the 2012 operation and result in the harassment of a much greater number walruses from this important habitat. *Id.* at 13-14, ¶ 17.[5]

Walruses are under dire threat due to rapid sea-ice loss, which has led the Service to conclude that listing the species as threatened or endangered under the Endangered Species Act

---

[4] The Marine Mammal Commission is an independent agency established by Congress to oversee marine mammal conservation policies and programs being carried out by federal regulatory agencies and to make recommendations to the Secretary on matters related to marine mammals. 16 U.S.C. § 1402(a), (d).

[5] Moreover, even walruses outside of the immediate Burger Prospect area, including those in transit, could be substantially affected by operations miles away. *See* Ex. 3 at 19 & Ex. 6 at 6 (stating walruses react to icebreaking at distances of up to 20-25 kilometers and move to areas where sound levels are only slightly above ambient sound); Doc. 10-6 at 19-21, Ex. 3 at 19 & Ex. 4 at 28 (describing that ice breaking itself occurs at significant distances from the drilling sites).

is warranted. Doc. 47 at 12-13. Indeed, the walrus population already is in steep decline, because, with the disappearance of sea ice, walruses are unable to access sufficient foraging habitat. Ex. 2 at 4-7, ¶¶ 4-8. Walruses chased away from their chosen feeding ground at the Burger Prospect will expend energy moving to other habitat, be at greater risk of depleting the prey resources in that habitat, and will more likely face competition for those prey resources. *Id.* at 12-14, ¶¶ 16-17; *see also id.* at 5-7, ¶¶ 6-8. For the Pacific walrus, such displacement is tantamount to loss of habitat, which compounds the already detrimental effects of climate change on them. *Id.* at 14, ¶ 17. Even walruses that remain in the Burger Prospect area likely will suffer adverse consequences. *Id.* at 13, ¶ 16. *See also* Ex. 3 at 20 ("[i]ncreases in physiological stress of adults or juveniles may reduce fitness and have implications for productivity and survivorship over time."); Ex. 5 at 12 (females with dependent young the "least tolerant" of disturbances).

The combined effects of this displacement likely will cause a population-level decline in the already imperiled walrus stock. Ex. 2 at 3-4, 12-14 ¶¶ 3, 16-17. Because walruses are already losing access to suitable foraging habitat due to climate change and diminished seasonal sea ice, those walruses displaced from their foraging grounds by Shell's operations likely will not be able to make up the missed feeding opportunities elsewhere. *Id.* This loss of feeding opportunities, in turn, will lead to a deterioration in at least some of the displaced walruses' condition, health, survival, and reproduction. *Id.* at 13-14 ¶ 17. The walrus population likely would take years to recover from the negative effects of Shell's planned drilling and other industrial operations for this summer. *Id.*

This likely impact to walrus survival and reproductive success leading to durable effects on the walrus population is irreparable harm and supports issuance of an injunction. This is particularly the case for a species protected by the MMPA, for which Congress has generally

prohibited all take—including both physical injury and behavioral harassment, 16 U.S.C. § 1362(13), (18)—and even the exceptions prohibit more than negligible impacts on a population, *id*. §1371(a)(5)(A)(i).[6] *See, e.g., Natural Res. Def. Council, Inc. v. Evans*, 279 F. Supp. 2d 1129, 1188 (N.D. Cal. 2003) (harassment of marine mammals affecting essential feeding and other behaviors is the type of harm justifying an injunction in light of purposes of MMPA); *cf. Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1064, 1067-68 (9th Cir. 1996) (citing Congressional intent and the underlying statute in support of finding that harm in the form of habitat loss affecting essential wildlife behavior patterns justifies injunction); *Defenders of Wildlife v. Martin*, 454 F. Supp. 2d 1085, 1099 (E.D. Wash. 2006) (finding snowmobiling that would harass caribou and preclude use of historic habitat amounted to irreparable harm and granting injunction based in part on statutory purpose).

## III. THE BALANCE OF EQUITIES TIPS SHARPLY IN FAVOR OF PLAINTIFFS

"When environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (quotations and citations omitted). Here, Shell's activities pose a likelihood of irreparable harm to walruses from noise and other disturbance.

[6] Plaintiffs seek relief here based on displacement and loss of habitat for thousands of walruses, leading to irreparable impacts expressed at the population level; Plaintiffs do not ask for an injunction in this case based on harm to individual walruses. Thus, the separate question of whether in some circumstances harm to individual animals may justify injunctive relief is not before this Court. *Compare Friends of Animals v. Bureau of Land Mgmt.*, No. 3:15-CV-0057-LRH-WGC, 2015 WL 555980, at *1 (D. Nev. Feb. 11, 2015) (harm to 200 individuals of a species is irreparable); *Seattle Audubon Soc'y v. Sutherland*, No. C06-1608MJP, 2007 WL 2220256, at *16 (W.D. Wash. Aug. 1, 2007) (harm to individuals of a protected species is irreparable), *with Defenders of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1210 (D. Mont. 2009) (harm to individuals of a protected species is irreparable only when "significant" to the "overall population").

There are no unusual circumstances that might excuse the need to preserve the status quo and prevent such harm. The Federal Defendants will suffer no harm if an injunction is granted, and Shell would incur only the economic harm of delaying its exploration plan for the length of an expedited appeal. Any economic harm Shell may incur does not outweigh the likely irreparable harm to the environment from the exploration activities. *See League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765-66 (9th Cir. 2014) (holding economic harm of temporary delay does not outweigh the permanent harms to the environment); *Alaska Wilderness League v. Kempthorne*, 548 F.3d 815, 820 (9th Cir. 2008) (noting stay was granted in challenge to an exploration plan for offshore drilling by Shell in the Arctic), *withdrawn and vacated*, 559 F.3d 916 (9th Cir. 2009), *and dismissed as moot sub nom. Alaska Wilderness League v. Salazar*, 571 F.3d 859 (9th Cir. 2009); *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) (stating that a cruise ship company's "loss of anticipated revenues, however, does not outweigh the potential irreparable damage to the environment"), *abrogated in part on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010); *Idaho Sporting Cong.*, 222 F.3d at 569 (holding that the financial hardship to the Forest Service, intervenor-defendants, and local communities did not outweigh environmental harm from the logging of old-growth forests).

## IV. THE PUBLIC INTEREST FAVORS AN INJUNCTION

Both the MMPA and NEPA represent Congressional determinations that federal agencies should protect wildlife and the environment. *See* 16 U.S.C. § 1361; 42 U.S.C. § 4321. An injunction that prevents harmful activities approved in violation of the MMPA and NEPA furthers the statutes' purposes and thereby protects the public interest. *See Alliance for the Wild Rockies*, 632 F.3d at 1138 (noting "[t]he public interest in careful consideration of

environmental impacts before major federal projects go forward" and that "suspending such projects until that consideration occurs comports with the public interest") (citation and quotation omitted); *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 737; *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991) (requiring federal agencies to act in accordance with the law is "a public interest of the highest order"), *aff'd*, 952 F.2d 297 (9th Cir. 1991).

CONCLUSION

For the reasons above, Plaintiffs request the Court enter an order staying the effectiveness of the ITR and LOA pending appeal. Alternatively, should the Court determine that a comprehensive injunction pending appeal is not warranted, Plaintiffs request that the Court enter an injunction until July 31, 2015, allowing the Ninth Circuit time to decide a motion for injunction pending appeal.

Respectfully submitted this 8th day of July, 2015.

*s/ Erik Grafe*
Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.792.7102
E: egrafe@earthjustice.org

Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801-1145
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Alaska Wilderness League, Center for Biological Diversity, Greenpeace, Inc., Resisting Environmental Destruction on Indigenous Lands, and Sierra Club*

*s/ Nathaniel S.W. Lawrence (consent)*
Nathaniel S.W. Lawrence (Wash. Bar No. 30847)
(*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
3723 Holiday Drive, SE
Olympia, WA 98501
T: 360.534.9900
E: nlawrence@nrdc.org

Jared E. Knicley (Va. Bar No. 84060) (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th Street NW, Suite 300
Washington, DC 20005
T: 202.513.6242
E: jknicley@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2015, a copy of the foregoing PLAINTIFFS' RULE 62(c) MOTION FOR INJUNCTION PENDING APPEAL, with accompanying exhibits and Proposed Order, was served electronically on Meredith Lisa Flax, David B. Glazer, Jeffrey W. Leppo, and Ryan P. Steen.

*s/ Erik Grafe*
Erik Grafe

## TABLE OF EXHIBITS

| Exhibit No. | AR Page Nos. | Description |
|---|---|---|
| 1 | - | U.S. Fish and Wildlife Service, Letter of Authorization, Incidental Take (15-CS-02) (June 30, 2015) |
| 2 | - | Declaration of Timothy J. Ragen (July 7, 2015) |
| 3 | - | Bureau of Ocean Energy Management, Shell Gulf of Mexico, Inc. Revised Outer Continental Shelf Lease Exploration Plan, Chukchi Sea, Alaska, Burger Prospect: Posey Area Blocks 6714, 6762, 6764, 6812, 6912, 6915 Revision 2 (March 2015), Environmental Assessment, OCS EIS/EA BOEM 2015-020 (May 2015) (excerpts) |
| 4 | - | Shell Gulf of Mexico Inc., Exploration Plan, App. C, Environmental Impact Analysis, Revision 2, Chukchi Sea, Alaska, Burger Prospect: Posey Area Blocks 6714, 6762, 6764, 6812, 6912, 6915, Chukchi Sea Lease Sale 193 (Mar. 2015) (excerpts) |
| 5 | ARITR00059715-ARITR00060337 | Minerals Management Service, Chukchi Sea Planning Area, Oil and Gas Lease Sale 193 and Seismic Surveying Activities in the Chukchi Sea, Final Environmental Impact Statement, OCS EIS/EA MMS 2007-026 (May 2007) (excerpts) |
| 6 | - | Bureau of Ocean Energy Management, Chukchi Sea Planning Area, Oil and Gas Lease Sale 193 in the Chukchi Sea, Alaska, Final Second Supplemental Environmental Impact Statement, OCS EIS/EA BOEM 2014-669 (Feb. 2015) (excerpts) |